T.C. Memo. 1997-146

UNITED STATES TAX COURT

CAMILLE D. SANDS, ET AL.,[1] Petitioners v. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket Nos. 491-94, 888-94,                    Filed March 20, 1997.
            955-94.

Thomas J. Mitchell, for petitioners.

Patrick J. Murphy, pro se, in docket No. 955-94.

Pamela S. Wilson and Elizabeth A. Maresca, for respondent.


MEMORANDUM OPINION

CLAPP, Judge:  Respondent determined the following

deficiencies, additions to tax, and accuracy-related penalties in

petitioners' Federal income taxes:

---

[1] Cases of the following petitioners are consolidated
herewith:  Kenneth and Maria Heller, docket No. 888-94; and
Patrick J. Murphy, docket No. 955-94.

Camille D. Sands - docket No. 491-94:

| | | Additions to tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| 1984 | $5,935 | $297 | * | -- | -- | $1,484 |
| 1985 | 15,731 | 787 | * | -- | -- | 3,933 |
| 1986 | 27,448 | -- | -- | $1,372 | * | 6,862 |

_____

*Fifty percent of the interest due on the portion of the underpayment attributable to negligence.

Kenneth and Maria Heller - docket No. 888-94:

| | | Accuracy-related penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1989 | $234,141.60 | $46,828.32 |

Patrick J. Murphy - docket No. 955-94:

| | | Accuracy-related penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1989 | $329,292.97 | $65,858.59 |

Respondent also determined that petitioners are liable for increased interest pursuant to section 6621(c) (formerly 6621(d))[2] for each of the taxable years in issue.

_____

[2]Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. For convenience, we
(continued...)

The issues for decision are:

(1)  Whether petitioner Sands is entitled to deductions related to Lone Star Associates (Lone Star), a partnership.  We hold that she is to the extent stated herein.

(2)  Whether, pursuant to the doctrines of res judicata or collateral estoppel, respondent must offer petitioner Sands a settlement for the taxable years 1984, 1985, and 1986 analogous to the settlement between petitioner Murphy and respondent for the taxable years 1985 and 1986.  We hold that respondent is not required to offer Sands the settlement.

(3)  Whether Lone Star received $258,968 from Electro in cancellation of a lease.  We hold that it did not.

(4)  Whether Lone Star recognized income when it was released from a debt obligation.  We hold that it did.

(5)  Whether, in 1989, petitioner Murphy owned a 9.53-percent interest or a 50-percent interest in Lone Star.  We hold that Murphy owned a 9.53-percent interest in Lone Star in 1989.

(6)  Whether petitioners are liable for increased interest under section 6621.  We hold that they are not.

(7)  Whether petitioner Sands is liable for additions to tax for negligence under section 6653(a)(1) and (2) for the taxable

---

[2](...continued)
refer to this section as sec. 6621(c).  The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

years 1984 and 1985, and under section 6653(a)(1)(A) and (B) for the taxable year 1986.  We hold that she is not.

(8)  Whether petitioner Sands is liable for an addition to tax under section 6661 for a substantial understatement of tax for each of the taxable years 1984, 1985, and 1986.  We hold that she is.

(9)  Whether petitioners Heller and Murphy are liable for an accuracy-related penalty for a substantial understatement of income tax under section 6662 for the taxable year 1989.  We hold that they are.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

We have combined our findings of fact and opinion.  Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and attached exhibits.

At the time the petitions were filed, Kenneth and Maria Heller and Camille D. Sands (Sands) resided in New York, New York, and Patrick J. Murphy (Murphy) resided in Brooklyn, New York.  Murphy, an attorney, was the only witness at trial.

These cases relate to Lone Star in which Sands, Kenneth Heller (Heller), and Murphy were each general partners. Respondent determined deficiencies as to Sands for the taxable years 1984, 1985, and 1986 on the theory that the deductions

taken by Lone Star should be disallowed.  Respondent determined deficiencies as to Heller and Murphy for the taxable year 1989 on the theory that Lone Star recognized income when it was released from a debt obligation.

A.    Background

In 1983, Murphy represented Micro-Bio (Ireland) Ltd. (Micro-Bio), a corporation formed under the laws of Ireland, in the acquisition of a chlor-alkali system, a system which produces chlorine.  Murphy traveled to Arizona with Micro-Bio executives to see a chlor-alkali system in use.  Micro-Bio executives liked what they saw and decided to purchase a chlor-alkali system from Eltech, Ltd. (Eltech), the manufacturer of the chlor-alkali system.

On August 8, 1983, Micro-Bio entered into a letter agreement with Eltech in which Micro-Bio agreed to purchase the chlor-alkali system.  The relevant terms of the letter agreement include the following:  (1) A lease period of 5 years with interest calculated on the complete contract amount from the shipment date of the equipment; (2) payments were to commence 30 days after plant startup and were to continue for 59 consecutive months; (3) the equipment passed to Micro-Bio after the 5-year lease period; (4) the equipment remained the property of Eltech at all times throughout the 5-year lease period; (5) Micro-Bio had the option to obtain a third-party lease or financing subject to Eltech's approval; (6) Micro-Bio would insure the equipment;

and (7) Micro-Bio would pay a fee for any technical assistance provided by Eltech during the lease period.

No purchase price was set forth in the letter agreement, but the parties agree that the purchase price due Eltech from Micro-Bio for the chlor-alkali system was $2,121,798. The letter agreement purports to be a lease between Eltech and Micro-Bio; however, we find that the terms of the transaction constitute a sale in which Eltech retained a security interest. See generally Bowen v. Commissioner, 12 T.C. 446, 459-460 (1949).

The letter agreement provided that the conditions set forth therein "together with ELTECH's other required lease conditions" shall be formalized in a lease document entered into between Eltech and Micro-Bio. No such lease document has been made part of the record. Based on Murphy's description of the transactions and from other documents that incorporate by reference the September 1983 agreement, we find that Eltech and Micro-Bio did enter into an agreement in September 1983 (September 1983 agreement) in which Micro-Bio agreed to purchase the chlor-alkali system from Eltech for a purchase price of $2,121,798. Eltech financed the purchase with a nonrecourse debt of $2,121,798. The record does not state whether the debt was recourse or nonrecourse. We find for purposes of this opinion that the debt was nonrecourse, since there apparently was no attempt by Eltech to recover from Lone Star or the general partners personally after Lone Star assumed Micro-Bio's obligations to Eltech (as

noted infra).  A principal payment of $338,950.86 was due in the first year, and principal payments of $445,711.80 were due in each of years 2 through 5.  No evidence shows the interest due on the unpaid principal balance.

Micro-Bio never completed the purchase.  Micro-Bio preferred to lease the chlor-alkali system rather than purchase it.  Murphy saw this as an opportunity, and he formed Lone Star, a general partnership, to purchase the chlor-alkali system from Eltech and then lease the system to Electro Systems (Electro), a subsidiary of Micro-Bio.  Sands, Heller, Murphy, and two other individuals not involved in these cases, Miller and Wiener, were partners in Lone Star.  Murphy managed Lone Star, and Lone Star intended to profit from the venture.  Each partner's distributive share of income, gain, loss, deduction, or credit was made in accordance with the partner's interest in the partnership.

On September 20, 1983, Micro-Bio and Lone Star entered into an agreement (Micro-Bio/Lone Star agreement) whereby Micro-Bio sold to Lone Star the contract rights to acquire the chlor-alkali system from Eltech pursuant to the September 1983 agreement. Lone Star paid Micro-Bio $500,000 for Micro-Bio's contract rights, and Lone Star assumed Micro-Bio's obligations to Eltech.

The Micro-Bio/Lone Star agreement also provided that Micro-Bio would lease the chlor-alkali system from Lone Star for 5 years (Micro-Bio/Lone Star lease agreement).  Payments under the Micro-Bio/Lone Star lease agreement consisted of $338,950.86 for

year 1, and $445,711.80 in each of years 2 through 5, plus a further payment by Micro-Bio to Lone Star of $140,000 per annum over the 5-year period. At the end of the 5-year lease period, Micro-Bio could purchase the chlor-alkali system from Lone Star for $500,000, or Micro-Bio could lease the system for the next succeeding 5 years for $140,000 per annum.

Lone Star entered into a lease agreement with Miro-Bio's subsidiary, Electro (Lone Star-Electro lease), in which Lone Star agreed to lease the chlor-alkali system to Electro. The Loan Star-Electro lease is not dated. The Lone Star-Electro lease provided for monthly payments of $19,349.16 for the first 6 months and $37,142.65 for the following 54 months, for total payments of $2,121,798.06.

Around May 1984, Electro installed and put into service the chlor-alkali system. Problems plagued Electro's operation of the chlor-alkali system, and it never operated properly. In 1984, Electro stopped making rental payments to Lone Star under the Lone Star-Electro lease, and in turn, Lone Star stopped making payments to Eltech. Lone Star depreciated the chlor-alkali system in the taxable years 1984, 1985, and 1986 and passed the depreciation deductions through to its partners.

The poor operation of the chlor-alkali system led to disputes between Lone Star, Eltech, Micro-Bio, and Electro. These disputes were settled in 1989.

Under the terms of the settlement, Eltech forgave and canceled payment of the $2,069,656 balance due from Lone Star. At the time of the settlement, Lone Star's adjusted basis in the chlor-alkali system was $1,019,104 ($2,621,798 cost basis less $1,602,694 of depreciation deductions). At the direction of Eltech, Lone Star, "as beneficial owner", transferred full ownership of the chlor-alkali system to Electro and agreed to relieve Electro of all obligations under the Lone Star-Electro lease. Electro agreed to pay Lone Star some amount, which was determined by respondent to be $258,986, but Electro never fulfilled that obligation.

B.   Petitioner Sands

Respondent argues that Sands deducted amounts in excess of her distributive shares of the partnership items. Sands owned a 5-percent, 7-percent, and 7.5-percent partnership interest in Lone Star during the taxable years 1984, 1985, and 1986, respectively, and her distributive share of the partnership items for each taxable year is limited accordingly.

1.   Depreciation Deductions

Respondent argues that Sands is not entitled to depreciation deductions, because the chlor-alkali system was never placed in service. Electro installed and operated the chlor-alkali system in 1984, and we find that the system was placed in service at that time. We recognize that problems plagued the system's

operation, but those problems were not so severe as to prevent the system from being placed in service.

Respondent argues that we should disregard Lone Star's $2,621,798 cost basis in the system, because there were no arm's-length negotiations over the purchase price. To support this argument, respondent notes that Murphy served as legal counsel for Micro-Bio when Micro-Bio acquired the chlor-alkali system technology from Eltech. There is no evidence that Murphy influenced the terms of the transaction between Micro-Bio and Eltech. Before Lone Star agreed to purchase the chlor-alkali system from Eltech, Murphy reviewed financial projections prepared by Micro-Bio. After reviewing the information at his disposal, Murphy concluded that the purchase of the chlor-alkali system was a sound investment. While the matter is not free from doubt, we find that Lone Star acquired the chlor-alkali system in an arm's-length transaction.

Sands is entitled to her share of the Lone Star depreciation deduction in each of the taxable years 1984, 1985, and 1986 based on the foregoing facts.

2. Interest Deductions and Other Deductions

Lone Star reported interest expenses of $70,360 and $48,786 for taxable years 1984 and 1985, respectively. Lone Star reported "other deductions" of $19,227 and $38,612 for taxable years 1984 and 1986, respectively. Sands deducted her proportionate shares of these items, and respondent disallowed

these deductions.  Sands offered no evidence to substantiate that Lone Star paid the amounts in dispute.  Sands submitted a payment notice addressed to her showing interest due on a loan in which she was the borrower.  Petitioners submitted two other statements showing interest paid on a loan to Kips Bay Associates, an entity that Murphy described as an investment of his.  There is no evidence that the interest amounts shown on the loan statements were Lone Star's obligations or that Lone Star paid those amounts.  There is no evidence that Lone Star paid the "other deductions" during the years in issue.  We sustain respondent's determination as to these items.

3.  <u>Application of Res Judicata or Collateral Estoppel</u>

Sands argues that the terms of two settlements entered into between Murphy and respondent should apply to her as well.  Sands argues that the doctrines of collateral estoppel and res judicata bind respondent to this result.  We do not agree.

Sands rests her argument on two cases filed by Murphy, which involved Murphy's taxable years 1985 and 1986:  <u>Murphy v. Commissioner</u>, docket No. 4949-91, and <u>Murphy v. Commissioner</u>, docket No. 5150-91 (docket Nos. 4949-91 and 5150-91).  Those cases involved Murphy's deductions associated with Lone Star. Those cases were never tried, and Sands was not a party in either case.  Murphy and respondent settled those cases and agreed that no deficiencies in income taxes were due and that no addition to tax under section 6651(a) was due for each of Murphy's taxable

years 1985 and 1986. This Court entered a stipulated decision in each case.

Collateral estoppel and res judicata protect litigants from the burden of relitigating an identical issue and promote judicial economy by preventing redundant litigation. Under the doctrine of collateral estoppel, or issue preclusion, the judgment in a prior lawsuit precludes, in the second cause of action, litigation of issues actually litigated and necessary to the outcome of the first action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). The doctrine of res judicata, or claim preclusion, precludes a party to a suit and its privies from again litigating a cause of action in which a court of competent jurisdiction has entered a final judgment on the merits. Meier v. Commissioner, 91 T.C. 273, 282 (1988). For res judicata to apply, the party invoking the doctrine must show: (1) The cause of action in the prior case is the same cause of action as in the instant case; (2) petitioner qualifies as a party or a privy of a party in the prior case; and (3) there was a final judgment on the merits in the prior case. Commissioner v. Sunnen, 333 U.S. 591, 597 (1948); Kroh v. Commissioner, 98 T.C. 383, 398-399 (1992).

We have not decided the correctness of respondent's determinations for Murphy's taxable years 1985 and 1986. This Court held no trial, received no evidence, and made no finding of fact. Murphy and respondent disposed of docket Nos. 4949-91 and

5150-91 through settlement.  The stipulated decisions in docket Nos. 4949-91 and 5150-91 were only a pro forma acceptance of an agreement between Murphy and respondent.  See United States v. International Bldg. Co., 345 U.S. 502, 506 (1953).  The stipulated decisions do not indicate the reason for the settlement.  Moreover, litigants generally arrive at settlement by mutual give and take.  Petitioner Sands and respondent are litigating the issues of this case for the first time. Furthermore, a partner solely by reason of the partnership relationship generally is not privy with the other partners, since one partner's interest is not derived from another partner but is an independent interest.  Mathisen v. Commissioner, 22 T.C. 995, 998 (1954).  It is Sands' tax liabilities, not Murphy's, that are being asserted against her.  The doctrines of collateral estoppel and res judicata are inapplicable here.

C.  Petitioners Murphy and Heller

1.  Lone Star's Income in Taxable Year 1989 From the Settlement With Electro

Respondent determined that Lone Star received $258,986 of taxable income from Electro in 1989.  To support this determination, respondent relies on the following:  Lone Star's settlement agreement with Electro, a handwritten worksheet attached to Lone Star's U.S. Partnership Return of Income (Form 1065) for the taxable year 1989, and a letter dated June 1, 1990, from Murphy to Internal Revenue Service agent Ronald Sherman (Sherman).

In the settlement agreement between Lone Star and Electro, Electro agreed to pay Lone Star the sum of $390,000. Murphy signed an affidavit dated September 11, 1992 (affidavit), when he settled docket Nos. 4949-91 and 5150-91 with respondent. In the affidavit Murphy stated: "The settlement provided that Electro would make a payment of $258,986.00 to * * * [Lone Star] and * * * [Lone Star] would relieve Electro of all obligations under the Lease." Murphy testified that Lone Star did not receive payment from Eltech pursuant to the settlement.

Lone Star's Form 1065 for the taxable year 1989, dated October 15, 1990, includes one income item under "Other income" in the amount of $3,176. A handwritten worksheet is attached to the 1989 Form 1065 with the following notations:

```
           1989

Lone Star/Sale of Rights
Receipts - cash      $258,986
forgiven - Debt     2,069,656
                                 $2,328,642
less
    Rights released    1,639,600
                         750,000   $2,389,600
                             loss     (60,958)
                           interest
```

Murphy testified that he inadvertently attached the worksheet to Lone Star's 1989 Form 1065. He testified that he prepared several worksheets, and this one related to the possibility of discounting, for $258,968, Electro's obligation to pay Lone Star $390,000. Lone Star pursued none of these alternatives.

In a letter to Sherman dated June 1, 1990, Murphy stated, "Please be advised that * * * [Lone Star's] 1989 Form 1065 will reflect receipt of $275,000 received as income in partial settlement of its claims."

We find that Lone Star did not receive $258,986 from Electro in 1989. The items highlighted by respondent indicate that Murphy may have <u>intended</u> to collect a payment from Electro pursuant to the 1989 settlement agreement, but we find that no such payment occurred in 1989.

2. <u>Lone Star's Disposition of the Chlor-Alkali System</u>

Petitioners concede that Eltech forgave the debt in the amount of $2,069,656 due from Lone Star. Petitioners argue that this amount does not constitute income in 1989 because (1) the debt was forgiven in 1987, and (2) the debt reduction qualifies as a price reduction pursuant to section 108(e)(5).

Petitioners' contention that the discharge of indebtedness occurred in 1987 directly contradicts Murphy's affidavit, which provides that in 1989 Electro, Micro-Bio, and Eltech settled all their disputes arising from Lone Star's purchase of the chlor-alkali system. The affidavit provides that Eltech relieved Lone Star of its obligation to pay $2,069,656. We sustain respondent's determination that the discharge of indebtedness in the amount of $2,069,656 occurred in 1989.

We further conclude that the discharge of debt by Eltech and Lone Star's release of its ownership in the chlor-alkali system

constitutes a sale or exchange.  See Yarbro v. Commissioner, 737 F.2d 479, 483-484 (5th Cir. 1984), affg. T.C. Memo. 1982-675; Gershkowitz v. Commissioner, 88 T.C. 984, 1016 (1987); Estate of Delman v. Commissioner, 73 T.C. 15, 33 (1979).  We reach this conclusion for several reasons.  First, Eltech's discharge of the debt and Lone Star's release of ownership in the chlor-alkali system were part of one settlement.  Second, we find that as part of the settlement, Eltech directed Lone Star to transfer ownership of the chlor-alkali system to Electro rather than have those rights transferred back to Eltech.  Third, we find incredible the contention that Eltech forgave over $2 million in debt owed by Lone Star, while at the same time letting Lone Star retain some ownership rights in the chlor-alkali system, and then in a "separate and distinct" transaction, Lone Star transferred its ownership rights in the chlor-alkali system to Electro.  We find that Eltech's discharge of the debt and Lone Star's transfer of its ownership rights were part of a single transaction.  Lone Star must recognize as gain the excess of the amount of debt forgiven over the adjusted basis of the chlor-alkali system. Secs. 61(a)(3), 1001(a); sec. 1.1001-2(a)(1), Income Tax Regs. Lone Star's partners must take into account their distributive shares of such gain.  Sec. 702(a).  As for petitioners' argument under section 108(e)(5), that section is not applicable to gains derived from dealings in property.  Gershkowitz v. Commissioner, supra.

3.  Murphy's Percentage Ownership of Lone Star in 1989

Lone Star's Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc. (K-1), attached to the Forms 1065 show the following partners and ownership percentages in Lone Star:

|         | 1984 | 1985   | 1986  | 1989 |
|---------|------|--------|-------|------|
| Sands   | 5    | 7      | 7.5   | --   |
| Heller  | 50   | 50     | 50    | 50   |
| Murphy  | 15   | 15     | 9.32  | 50   |
| Miller  | 15   | 15     | 15    | --   |
| Wiener  | 15   | 18.18  | 18.18 | --   |
| Total   | 100  | 105.18 | 100   | 100  |

Lone Star's 1988 Form 1065 indicates that Lone Star consisted of five partners and that the partnership had no activity in 1988. There are no K-1's attached to Lone Star's 1988 Form 1065.  If there was a 1987 Form 1065, it is not part of the record.

Murphy argues that he did not own 50 percent of Lone Star in 1989 and that amounts received by Lone Star in 1989 should be allocated to all five partners according to the 1986 ownership percentages.  We agree.  By 1989, Lone Star was settling its disputes with Eltech, Electro, and/or Micro-Bio.  We find that the ownership interests for the taxable year 1989 are the same as the ownership interests shown on Lone Star's 1986 Form 1065. Murphy intended the 1989 K-1's to reflect that he and Heller were the only partners with any active involvement in Lone Star during 1989, and their involvement stemmed from the ongoing dispute with

respondent. Murphy's filing of an erroneous K-1 in 1989 does not alter the ownership interests in Lone Star.

D. Increased Interest, Additions to Tax, and Penalty

   1. Increased Interest Pursuant to Section 6621

Respondent determined that petitioners are liable for increased interest under section 6621 with respect to the underpayments for Sands' taxable years 1984, 1985 and 1986, and for Heller's and Murphy's taxable year 1989. Section 6621 provides for an increase in the interest rate to 120 percent of the statutory rate on the underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Respondent argues that the underpayments are due to a tax-motivated transaction, because Lone Star's purchase of the chlor-alkali system was not a transaction entered into for profit. See Clayden v. Commissioner, 90 T.C. 656, 677 (1988).

As for Heller and Murphy, the increased rate of interest under section 6621(c) is inapplicable. Section 6621(c) was repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after December 31, 1989. OBRA 89 sec. 7721(d), 103 Stat. 2400. Murphy's tax return and Heller's tax return for the taxable year 1989 were due after that date. Sec. 6072(a). As for Sands, Murphy served as legal counsel for Micro-Bio when Micro-Bio executives traveled to Arizona to see one of Eltech's chlor-alkali systems in operation. Before Lone

Star agreed to purchase the chlor-alkali system from Eltech, Murphy reviewed financial projections prepared by Micro-Bio. Based on this information, Murphy concluded that the purchase of the chlor-alkali system was a sound investment for Lone Star. Technical problems after installation sapped the chlor-alkali system of its profit potential. We find section 6621(c) inapplicable under these circumstances.

   2. <u>Additions to Tax for Negligence</u>

Respondent determined that Sands is liable for additions to tax for negligence under section 6653(a)(1) and (2) for the taxable years 1984 and 1985 and section 6653(a)(1)(A) and (B) for the taxable year 1986. Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment that is attributable to negligence. For 1986, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment that is attributable to negligence.

Negligence is defined as the lack of due care or the failure to do what a prudent person would do under the circumstances.

Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 937 (1985).  Sands must establish that the negligence additions to tax do not apply.  Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Sands' underpayments stem from her inability to substantiate Lone Star's expenses.  Failing to keep or produce adequate books and records, as required by section 6001, may be justification for imposing the negligence additions to tax. Axelrod v. Commissioner, 56 T.C. 248, 258-259 (1971); Zafiratos v. Commissioner, T.C. Memo. 1992-135, affd. without published opinion 993 F.2d 880 (3d Cir. 1993).  We find that Sands is not liable for additions to tax for negligence for the taxable years 1984, 1985, or 1986.  Sands played a minimal role in Lone Star's activities.  She relied on Murphy to manage Lone Star and to keep adequate records to substantiate Lone Star's expenses.  Sands had no control over these matters.  See Antonides v. Commissioner, 91 T.C. 686, 700 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

3.  Substantial Understatement Addition to Tax and Accuracy-Related Penalty

Respondent determined an addition to tax under section 6661 against Sands for each of the taxable years 1984, 1985, and 1986. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax.  Pallottini v. Commissioner, 90 T.C. 498, 503 (1988).  An understatement exists where the amount

of tax shown on the taxpayer's return is less than the amount required to be shown on the return. Sec. 6661(b)(2)(A). In the case of individuals, an understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown. Sec. 6661(b)(1)(A). The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority. Respondent's determination of the addition to tax is presumed correct, and petitioner must prove otherwise. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, supra at 791-792.

Respondent determined that petitioners Heller and Murphy are liable for an accuracy-related penalty for a substantial understatement of income tax under section 6662 for the entire underpayments for their 1989 taxable year. Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment that is attributable to a substantial understatement of income tax.

Petitioners argue that substantial authority supports their respective positions. Substantial authority exists for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions. Accardo v. Commissioner, 942 F.2d 444, 453 (7th. Cir. 1991), affg. 94 T.C.

96 (1990); <u>Cramer v. Commissioner</u>, 101 T.C. 225, 255 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); sec. 1.6661-3(b), Income Tax Regs.  In light of our discussion above, we conclude that the authorities relied on by petitioners did not constitute substantial authority.

Accordingly, if recomputation of petitioners' tax liabilities reflects a substantial understatement, petitioner Sands is liable for the addition to tax, and petitioners Heller and Murphy are liable for the penalty.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>