# United States Tax Court

T.C. Memo. 2023-104

MICHAEL G. PARKER AND JULIE A. PARKER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 16021-16.                                   Filed August 10, 2023.

————

*Diana V. Lopez*, *Lisa J. Mendes*, and *Christina P. Weed*, for petitioners.

*Janice B. Geier*, *Gregory Michael Hahn*, *Jamie M. Powers*, and *Amy B. Ulmer*, for respondent.

## MEMORANDUM OPINION

NEGA, *Judge*: This deficiency case involves the tax treatment of nonrecourse debt canceled concurrently with the sale of real property by an S corporation wholly owned by petitioner Michael Parker.[1] After concessions,[2] the sole issue for decision is whether income from the cancellation of the nonrecourse debt should be included in the S corporation's amount realized on the sale of the real property or treated as cancellation of debt (COD) income and thus excluded from gross income pursuant to the section 108(a)(1)(B) insolvency exception.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Respondent has conceded several issues underlying the determined deficiency and has conceded that petitioners are not liable for an accuracy-related penalty under section 6662(a) or an addition to tax under section 6651(a)(1).

[*2]                               *Background*

This case was submitted fully stipulated pursuant to Rule 122. The Stipulation of Facts and the Exhibits attached thereto and the Stipulations of Settled Issues are incorporated herein by this reference. When the Petition was timely filed, petitioners resided in California.

I.     *The Entities*

In 2012 Exterra Realty Partners, LLC (Exterra), was an S corporation for federal income tax purposes. Exterra was a real estate development company operating in California. In 2012 Mr. Parker was the 100% shareholder, president, and chief executive officer of Exterra.

Exterra was the sole member of PLF-XIII, LLC, and PLF-XIV, LLC (together, PLF entities), each of which was a limited liability company (LLC) formed under Delaware state law in February 2007 and treated as a disregarded entity for federal income tax purposes. In turn PLF-XIII was the sole member of Montevina Phase I, LLC, while PLF-XIV was the sole member of Montevina Phase II, LLC; both Montevina Phase I and Montevina Phase II (together, Montevina entities) were LLCs formed under Delaware state law in February 2007 and treated as disregarded entities for federal income tax purposes. Separate from this structure, Mr. Parker was individually the sole member of another entity, PLF-XI, LLC, which, once again, was an LLC formed under Delaware state law and treated as a disregarded entity for federal income tax purposes. PLF-XI was a member of another LLC formed under Delaware law, 4815 Maple Drive Pleasant Hill – IA, LLC, which held real property in Iowa.

II.    *The Real Estate Dealings*

In March 2007, through the Montevina entities, Exterra purchased 23.6 acres of real property in Livermore, California (Livermore property), for the purpose of commercial development. In order to finance the purchase of the Livermore property, the following loans were obtained from NRFC WA Holdings, LLC, an unrelated third-party lender:

**[*3]**

| Description | Parties | Amount |
|---|---|---|
| Loan N709A – Phase I Senior Mortgage | Montevina Phase I & NRFC WA Holdings | $20,120,000 |
| Loan N709B – Phase II Senior Mortgage | Montevina Phase II & NRFC WA Holdings | 4,230,000 |
| Loan N712A – Phase I Mezzanine Loan | PLF-XIII & NRFC WA Holdings | 5,030,000 |
| Loan N712B – Phase II Mezzanine Loan | PLF-XIV & NRFC WA Holdings | 2,820,000 |
| Loan N713 – Iowa Mezzanine Loan | PLF-XI & NFRC WA Holdings | 2,000,000 |

PLF-XI used Loan N713 to contribute $1,500,000 to Montevina Phase I and $500,000 to Montevina Phase II. Mr. Parker personally signed a guaranty for payment of all five loans. Loans N709A, N709B, N712A, and N712B were each nonrecourse as to Exterra. Loans N712A and N712B were mezzanine loans,[3] which were secured by a pledge of the PLF entities' membership interests in the Montevina entities. Loan N713 was a mezzanine loan, which was secured by a pledge of PLF-XI's membership interest in 4815 Maple Drive Pleasant Hill – IA, LLC. At some point around or after March 2007, a separate entity, NRFC WA Holdings II, LLC, acquired from NRFC WA Holdings all of the loans relating to the purchase and development of the Livermore property by Exterra or its subsidiaries.

On October 4, 2012, Exterra entered into an agreement to sell the Livermore property to a pair of unrelated individual third-party purchasers (Buyers). A number of contractual agreements were executed by the various parties, each dated October 4, 2012. In a membership interest purchase and sale agreement, the PLF entities agreed to sell their sole membership interests in the Montevina entities to the Buyers in exchange for nominal consideration. In a consent and release agreement between the Montevina entities, Mr. Parker, NRFC

---

[3] A mezzanine loan is a type of hybrid financing often used in commercial real estate, where the debtor typically pledges as collateral its equity interest in another entity. *See, e.g.*, *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 87 n.1 (2d Cir. 2013). With respect to a mezzanine loan, the creditor thus sits in an intermediate position to recover from the debtor, junior to any mortgage debt but senior to equity. *See* Andrew R. Berman, *Risks and Realities of Mezzanine Loans*, 72 Mo. L. Rev. 993, 998 (2007) ("Like a theater, mezzanine debt sits in the mezzanine section between senior debt in the more expensive orchestra, and equity sitting in the cheaper section of the balcony.").

[*4] WA Holdings II, and the Buyers, the Buyers agreed to assume Mr. Parker's personal guaranty obligations on the Phase I Senior Mortgage and the Phase II Senior Mortgage. The consent and release agreement provided that the Buyers would make a partial payment of $7,400,000 on the Phase I mortgage to NRFC WA Holdings II. As part of the consent and release agreement, Mr. Parker also agreed to deliver the deed to the Iowa property in escrow, with release of the deed to NRFC WA Holdings II to be made more than three years later, in January 2015. The consent and release agreement also included the following recital: "[NRFC WA Holdings II] has agreed to consent to the Subject Transactions, the termination of the Existing Mezzanine Loans, and the assumption by [the Buyers] of the obligations of [Mr. Parker] . . . subject to the terms and conditions stated below, including, without limitation, consummation of the Subject Transaction, [NRFC WA Holdings II's] receipt of the [$7,400,000 payment] and the execution of the agreements and documents . . . ."

In a pair of loan termination agreements, NRFC WA Holdings II agreed to cancel the unpaid balance of the mezzanine Loans N712A and N712B owed by the PLF entities, including all accrued interest and related fees and costs. Both loan termination agreements included the following recital: "In connection with the proposed sale by [the PLF entities] of all of [their] interest[s] in [the Montevina entities], [the PLF entities] and [NRFC WA Holdings II] have agreed to terminate the Loan Documents on the terms, and subject to the conditions, set forth herein."

Exterra realized the following amounts from the Buyers' assumption of debt:

| Entity | Description of Debt Assumed | Amount |
|---|---|---|
| Montevina Phase I | Loan N709A | $19,527,134.91 |
| Montevina Phase I | Deferred interest on Loan N709A | 2,462,746.99 |
| Montevina Phase I | Funds from Mezzanine | 6,240,364.69 |
| Montevina Phase I | Other liabilities – lender advances | 2,055,475.28 |
| Montevina Phase II | Loan N709B | 4,409,594.28 |
| Montevina Phase II | Deferred interest on Loan N709B | 580,449.98 |
| Montevina Phase II | Funds from Mezzanine | 5,309,773.81 |
| **Total** | | **$40,585,539.94** |

In addition, Exterra realized the following amounts from the debt canceled by NRFC WA Holdings II:

[*5]

| Entity | Description of Canceled Debt | Amount |
|---|---|---|
| PLF-XIII | Loan N712A | $5,030,000.00 |
| PLF-XIII | Accrued Interest on Loan N712A | 2,879,856.79 |
| PLF-XIII | Loan N712A Outstanding Junior Participation Interest | 700,000.00 |
| PLF-XIV | Loan N712B | 1,920,000.00 |
| PLF-XIV | Accrued Interest on Loan N712B | 1,768,972.00 |
| PLF-XIV | Loan N712B Outstanding Junior Participation Interest | 400,000.00 |
| **Total** | | **$12,698,828.79** |

III.  *Tax Reporting*

For tax year 2012 Exterra filed an original Form 1120S, U.S. Income Tax Return for an S Corporation.  On its original Form 1120S, Exterra reported $53,284,369 in gross receipts, which consisted of (1) the debt assumed by the Buyers in the sale of the Livermore property and (2) the cancellation of the mezzanine loans.  After offsetting cost of goods sold and deductions, Exterra reported ordinary business income of $2,741,399.  Exterra subsequently filed an amended Form 1120S, in which it reduced its gross receipts by $2,741,399 and attached Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment).  On the Form 982 Exterra reported $2,741,399 as a discharge of indebtedness excluded to the extent insolvent and reduced its basis of depreciable property and net operating loss in corresponding amounts.  The $2,741,399 related to the cancellation of debt for Loan N712A and/or Loan N712B.  As of October 4, 2012, Exterra was insolvent up to $2,741,399.  This change resulted in Exterra's reporting zero in ordinary business income on the amended Form 1120S.  Exterra issued an amended Schedule K–1, Shareholder's Share of Income, Deductions, Credits, etc., to Mr. Parker to reflect the reduction in ordinary business income.  Exterra did not include in income any amounts relating to Loan N713 on either its original or amended Form 1120S.

For tax year 2012 petitioners filed an original Form 1040, U.S. Individual Income Tax Return, on which they reported $2,741,399 in flowthrough income from Exterra.  Subsequently, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 2012,

**[\*6]** reflecting the amended Schedule K–1 and reporting zero in flowthrough income from Exterra.

## IV.  *The Notice of Deficiency and the Petition*

On April 15, 2016, respondent issued to petitioners a notice of deficiency for tax year 2012 determining a $3,111,363 deficiency, a $157,224.40 section 6651(a)(1) addition to tax, and a $622,327.20 section 6662(a) accuracy-related penalty.  The determined deficiency included an upward adjustment to Exterra's gross receipts of $2,741,399.  Petitioners timely filed a Petition disputing respondent's deficiency determinations.

## *Discussion*

## I.  *Jurisdiction and Burden of Proof*

Where a notice of deficiency issued to an S corporation shareholder includes adjustments to both S corporation items and other items unrelated to the S corporation, we have jurisdiction to determine the correctness of all adjustments in the shareholder-level deficiency proceeding.  *See Johnson v. Commissioner*, No. 19973-18, 160 T.C., slip op. at 11 (Jan. 25, 2023) (citing *Winter v. Commissioner*, 135 T.C. 238, 245–46 (2010)).  We thus have jurisdiction to redetermine the correctness of respondent's adjustments to petitioners' flowthrough share of Exterra's income and any other determinations in the notice of deficiency.

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous.[4]  Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Rapp v. Commissioner*, 774 F.2d 932, 935 (9th Cir. 1985).  The submission of this case to the Court under Rule 122 does not change or otherwise lessen petitioners' burden of proof.  *See* Rule 122(b).

---

[4] The burden of proof may shift from the taxpayer to the Commissioner in certain circumstances under section 7491(a), but petitioners do not allege, nor does the evidence suggest, that the burden of proof should shift to respondent under section 7491(a) as to any issue of fact.

**[\*7]** II.     *Tax Treatment of Debt Cancellation*

Section 61(a) broadly defines gross income as "all income from whatever source derived." Section 61(a)(3) specifies that gross income includes "[g]ains derived from dealings in property," while section 61(a)(12) does the same for "[i]ncome from discharge of indebtedness."[5] *See Gehl v. Commissioner*, 102 T.C. 784, 789 (1994) ("[P]aragraphs (3) and (12) of section 61(a) are separate, independent, and not overlapping provisions in respect of the includability of a particular item in income."), *aff'd*, 50 F.3d 12 (8th Cir. 1995). The distinction between these two subcategories of gross income—gain from property and COD income—can have significant tax consequences.

When a taxpayer sells or disposes of property, the amount realized is equal to the amount of money plus the fair market value of any property received. § 1001(b). When a taxpayer sells or otherwise disposes of property encumbered by nonrecourse debt,[6] the amount of the outstanding debt is typically included in the amount realized.[7] *See Commissioner v. Tufts*, 461 U.S. 300, 317 (1983); *Crane v. Commissioner*, 331 U.S. 1, 14 (1947); *Milkovich v. United States*, 28 F.4th 1, 8 (9th Cir. 2022); Treas. Reg. § 1.1001-2(a)(1). To the extent that the amount realized exceeds the taxpayer's basis in the property, the taxpayer has gain. *See* § 1001(a).

In contrast, a COD that is not part of a sale or exchange of property generally results in COD income, which may then be subject to certain statutory exclusions. *See* § 108(a)(1); *see also Estate of Delman v. Commissioner*, 73 T.C. 15, 31–32 (1979). Relevantly, section 108(a)(1)(B) allows a taxpayer who is insolvent at the time of a debt cancellation to exclude COD income from gross income. The amount of this exclusion is limited to the amount of the taxpayer's insolvency, i.e., the amount by which the taxpayer's liabilities exceed the fair market

---

[5] After 2012, the year at issue, section 61(a)(12) was renumbered as section 61(a)(11).

[6] "Indebtedness is generally characterized as 'nonrecourse' if the creditor's remedies are limited to particular collateral for the debt and as 'recourse' if the creditor's remedies extend to all the debtor's assets." *Simonsen v. Commissioner*, 150 T.C. 201, 205 (2018) (quoting *Great Plains Gasification Assocs. v. Commissioner*, T.C. Memo. 2006-276, 92 T.C.M. (CCH) 534, 550).

[7] If the sold or disposed-of property instead secures recourse debt, the amount realized does not include amounts that would otherwise be COD income (i.e., debt relief in excess of the fair market value of the underlying property). *See Frazier v. Commissioner*, 111 T.C. 243, 245 (1998); Treas. Reg. § 1.1001-2(a)(2).

[*8] value of their assets.  § 108(a)(3); *see White v. Commissioner*, T.C. Memo. 2023-77, at *3.

In deciding whether debt relief results in gain or COD income, we focus on the facts and circumstances surrounding how the taxpayer-debtor satisfied or extinguished the underlying debt.  *See Danenberg v. Commissioner*, 73 T.C. 370, 381 (1979); *Peninsula Props. Co. v. Commissioner*, 47 B.T.A. 84, 91–92 (1942).  If nonrecourse debt relief is conditioned upon a sale or exchange of property or is otherwise a part of that underlying sale or exchange, the amount of debt relief is properly included in the amount realized and is not COD income.  *See Simonsen*, 150 T.C. at 211 (focusing on fact that lender's willingness to cancel mortgage debt was completely dependent on debtor's willingness to convey proceeds from sale of residence); *Sands v. Commissioner*, T.C. Memo. 1997-146, 73 T.C.M. (CCH) 2398, 2403 (rejecting taxpayer's contention that COD was "separate and distinct" from transfer of ownership in property), *aff'd without published opinion sub nom. Murphy v. Commissioner*, 164 F.3d 618 (2d Cir. 1998); Treas. Reg. § 1.1001-2(a)(1) ("[T]he amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged *as a result* of the sale or disposition." (Emphasis added.)); *see also 2925 Briarpark, Ltd. v. Commissioner*, 163 F.3d 313, 319 (5th Cir. 1999) (concluding that debt relief "was closely intertwined" with underlying sale of property and thus included in amount realized on sale), *aff'g* T.C. Memo. 1997-298.  In such an instance, it is immaterial whether debt relief takes the form of an assumption of debt by a purchaser or a cancellation by a lender.  *See 2925 Briarpark, Ltd. v. Commissioner*, 163 F.3d at 319; *Simonsen*, 150 T.C. at 212–13.

Respondent contends that the $2,741,399 relating to the cancellation of Loans N712A and N712B is taxable to Exterra as gain derived from the sale of the Livermore property.  *See* § 61(a)(3).  Respondent emphasizes that Loans N712A and N712B were nonrecourse to Exterra and were canceled as part of the sale of the Livermore property.

Petitioners take a rather different approach.  In their briefing petitioners sidestep the threshold inquiry—whether the debt cancellation was part of the sale of the Livermore property and thus gave rise to gain—and focus on their contentions that either Exterra or petitioners themselves were insolvent at the time the debt was discharged.  *Cf. Gehl*, 102 T.C. at 789 ("Only after it is determined that [section 61(a)(12)] applies does one reach the question of the impact of

**[\*9]** insolvency and therefore the applicability of section 108."); *Danenberg*, 73 T.C. at 384 (rejecting taxpayers' argument that their insolvency precluded inclusion of debt relief in amount realized). As best we can tell, much of petitioners' briefing is premised on a misconception that facts relating to Mr. Parker in his personal capacity are relevant to the question of whether there was income to Exterra in 2012 (and only then, flowthrough income to Mr. Parker as its 100% S corporation shareholder). In determining whether to sustain respondent's upward adjustment to Exterra's gross receipts (and thus the corresponding deficiency with respect to petitioners), we respect Exterra's separate corporate existence. *See Durando v. United States*, 70 F.3d 548, 552 (9th Cir. 1995) ("[I]t [is] improper to treat income earned by [an S] corporation through its trade or business as though it were earned directly by its shareholders . . . ."); *Crook v. Commissioner*, 80 T.C. 27, 33 (1983) ("The separate existence of corporations is firmly established under the tax law, and this Court has recognized that the business of a subchapter S corporation is separate and distinct from that of its shareholders." (internal citation omitted)), *aff'd*, 747 F.2d 1463 (5th Cir. 1984). Accordingly, petitioners' observation, for instance, that Loans N712A and N712B were recourse as to Mr. Parker personally, is simply irrelevant to the issue before us.

We agree with respondent that the issue in this case is the threshold question of whether the cancellation of Loans N712A and N712B gave rise to gain or COD income for Exterra. We ultimately resolve that question in respondent's favor.

The parties have stipulated that Loans N712A and N712B were nonrecourse as to the PLF entities and Exterra. While the original loan agreements for Loans N712A and N712B are not part of the stipulated record, the parties further stipulated that Loans N712A and N712B were each mezzanine loans. The record establishes that Loan N712A and N712B were each secured by the PLF entities' pledge of their respective membership interests in the Montevina entities. Because the PLF entities and the Montevina entities were disregarded entities for federal income tax purposes, we treat Exterra as owning the underlying assets (i.e., the Livermore property), subject to the nonrecourse mezzanine Loans N712A and N712B, before the sale.[8] *See* Treas. Reg.

---

[8] For federal income tax purposes, we characterize the mezzanine Loans N712A and N712B, which were secured by pledges of equity in the disregarded Montevina entities, as nonrecourse debt encumbering the underlying Livermore

**[\*10]** § 301.7701-2(a) ("[I]f the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner."); *see also Pierre v. Commissioner*, 133 T.C. 24, 42 (2009) (Halpern, J., dissenting) ("A sole proprietorship is generally understood to have no legal identity apart from the proprietor."), *supplemented by* T.C. Memo. 2010-106. In turn the sale of the PLF entities' membership interests in the Montevina entities is characterized for federal income tax purposes as a sale of the encumbered Livermore property by Exterra. *See DAF Charters, LLC v. Commissioner*, 152 T.C. 250, 260 (2019) ("[A]ny items of income and loss generated by the [disregarded] entity are directly attributable to and reported by the entity's owner for Federal tax purposes . . . ."); *see also* Carter G. Bishop & Daniel S. Kleinberger, *Limited Liability Companies* § 2:83 Westlaw (database updated June 2023) ("The transfer of the interest in a disregarded entity is not treated as a transfer of the interest for federal tax purposes, but rather as a transfer of the assets of the disregarded entity.").

The record is further clear that the cancellation of Loans N712A and N712B was part of the sale by Exterra (through the disregarded entities) of the Livermore property to the Buyers. As the relevant loan termination agreements between the PLF entities and NRFC WA Holdings II represented, the loan cancellation was made "[i]n connection with the proposed sale." Further, the loan termination agreements were executed on October 4, 2012—the same date that the various other agreements effecting the sale of the Livermore property, including the consent and release agreement to which NRFC WA Holdings II was a party, were executed. The COD was part and parcel of the global agreement to convey the Livermore property, with NRFC WA Holdings II accepting new personal guaranties, a partial payment by the Buyers, and the escrowed deed to the Iowa property in consideration of that cancellation.

We conclude that NRFC WA Holdings II's cancellation of Loans N712A and N712B was dependent on Exterra's sale of the Livermore property to the Buyers and was a part of the same sale transaction. *See Simonsen*, 150 T.C. at 211. Accordingly, given that Loans N712A and N712B were nonrecourse as to Exterra, the amount of debt relief was properly includible in Exterra's amount realized on the sale of the

---

property in the hands of Exterra, the regarded entity; we note that the Commissioner has previously adopted a similar view in subregulatory guidance in a related context. *See* Rev. Proc. 2014-20, 2014-9 I.R.B. 614; I.R.S. Priv. Ltr. Rul. 09-53-005 (Dec. 31, 2009).

**[\*11]** Livermore property and gave rise to gain to the extent in excess of Exterra's basis in the property. *See* Treas. Reg. § 1.1001-2(a)(1). In turn, that gain flowed through to petitioners' personal income tax returns via Mr. Parker's 100% shareholder interest in Exterra.

III.    *Conclusion*

We hold that the $2,741,399 was properly includible in Exterra's amount realized on the sale of the Livermore property. We will sustain respondent's determination of a deficiency with respect to this issue.

To reflect the foregoing,

*Decision will be entered under Rule 155.*