# United States Tax Court

T.C. Memo. 2026-51

COLETTE BRANCH,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 7214-20.                                    Filed June 17, 2026.

————

*James R. Washington III*, for petitioner.

*Kristen I. Nygren*, *Andrew J. Lorenz*, *Emily A. Westermeier*, and *Ardney J. Boland*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: Petitioner failed to file returns for tax years 2015–17 (years at issue). Respondent prepared substitutes for returns (SFRs) pursuant to section 6020(b)[1] and issued a Notice of Deficiency to petitioner. Respondent determined the following deficiencies and additions to tax:

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Most monetary amounts are rounded to the nearest dollar.

[*2]

| Year | Deficiency | Additions to Tax/Penalties | | |
|------|-----------|----------------|----------------|---------|
| | | § 6651(a)(1) | § 6651(a)(2) | § 6654 |
| 2015 | $2,766,561 | $621,909 | *[2] | $1,415 |
| 2016 | 2,702,605 | 608,086 | * | 64,604 |
| 2017 | 2,856,528 | 642,698 | * | 68,390 |

Respondent's deficiency determinations pertained mostly to gross receipts not reported on Schedules C, Profit or Loss From Business, attributable to petitioner's sole proprietorship, A-1 Absolute Best Care, LLC (A-1). Petitioner agreed that she failed to report gross receipts for A-1 but claimed that respondent failed to account for (1) A-1's expenses that offset most of the unreported income, and (2) deductions claimed on Schedules A, Itemized Deductions, that petitioner is entitled to.

The parties have narrowed the issues in dispute. We must still decide (1) what petitioner's filing status is for the years at issue, (2) whether petitioner is entitled to certain Schedule A deductions contested by respondent, (3) whether A-1 incurred deductible Schedule C expenses greater than those respondent conceded, and (4) whether petitioner is liable for additions to tax pursuant to sections 6651(a)(1) and (2) and 6654. We hold that (1) petitioner's filing status for the years at issue is married filing separate, (2) petitioner is entitled to a portion of the Schedule A deductions respondent contested, (3) A-1 incurred deductible Schedule C expenses greater than those respondent conceded, and (4) petitioner is liable for additions to tax pursuant to sections 6651(a)(1) and (2) and 6654.

FINDINGS OF FACT

I.    *A-1's Business*

Since 1998[3] petitioner has owned and operated A-1 in the New Orleans metropolitan area in the State of Louisiana. A-1 cared for "clients" with intellectual handicaps (and, often, related physical handicaps) so that they would not need to live in institutions. A-1's

---

[2] As stated in the Notice of Deficiency, the amounts of the section 6651(a)(2) additions to tax were to be computed at a later date.

[3] Unless otherwise indicated, facts stated in this Opinion pertain to the years at issue.

**[*3]** clients are Medicaid recipients who are part of the New Opportunities Waiver (NOW) program,[4] and A-1 is subject to both federal and state laws and regulations regarding its services. The State of Louisiana monitors A-1 to ensure that it complies with legal requirements. During the years at issue A-1 cared for about 100 clients, and almost all of its gross receipts were from Medicaid.

A-1's services were aimed at helping its clients lead fulfilling, healthy lives as part of the New Orleans community. A-1 was licensed by the State of Louisiana to provide personal care attendants and supervised independent living services and to run an "Adult Day Care–Day Habilitation" program (daycare). The specific services that A-1 provided to clients were guided by comprehensive Plans of Care approved by the State of Louisiana annually. Each client had a Plan of Care tailored to the client's specific needs. Certain clients might be mostly independent and require only occasional assistance while other clients might require continuous care. Although A-1's services were guided by the Plans of Care, A-1's clients were adults who were permitted and encouraged to lead self-directed lives in the community like anyone else.

Some examples of the type of assistance A-1 and its caretakers would provide to clients were (1) transportation and admission to places clients wanted to visit, including restaurants, stores, movies, family events, volunteering activities, casinos, cultural events, sporting events/activities, and parks; (2) practicing and reinforcing appropriate behavior; (3) education, including basic math, literacy, and writing; (4) personal care, including bathing, dressing, bathroom use, haircuts, use of feeding tubes, and preparing nutritious foods; (5) securing housing and ensuring it remained habitable; (6) ensuring clients' medical needs were met; (7) ensuring evacuation/safety plans were in place should a natural disaster occur;[5] and (8) purchasing clothing, medicine, food, home goods, and various other items that clients needed. During certain activities, such as visiting restaurants or recreational venues, A-1 would provide clients with small amounts of cash to spend

---

[4] As described by the Louisiana Department of Health, "[t]he mission of the NOW [program] is to use the principles of self-determination to supplement the family and/or community supports while supporting dignity, quality of life, and security in the everyday lives of people, while maintaining the recipient in the community." New Opportunities Waiver (NOW), La. Dep't of Health, https://ldh.la.gov/office-for-citizens-with-developmental-disabilities/new-opportunities-waiver (last visited June 12, 2026).

[5] We take judicial notice that New Orleans is a coastal city at risk of hurricane and flood damage.

[*4] on food or activities. In addition, A-1 provided many clients with a cash allowance of $25 per week for miscellaneous spending. Such use of cash helped clients practice routine social interactions and work on math and financial skills.

A-1 owned several residential properties, and leased others, that were used to house clients. Some of A-1's clients had destructive episodes, and A-1 often had to repair damage to client housing. Because clients might have needs at any hour of the day, A-1 also provided nearby housing to some of its employed caretakers so that they could be close to clients and respond quickly if needed. These employees did not pay rent to A-1 or reimburse A-1 for rents that A-1 paid to lease a property. A-1 employed several people to maintain, repair, and clean properties, in addition to hiring outside contractors for certain work on properties. For example, A-1 employees/contractors paved the backyard of one property and installed a wheelchair ramp so that a client in a wheelchair living on the property could enjoy the outdoors more easily.

A-1 maintained an office, as well as a separate daycare facility with a capacity of 40 clients. At the daycare, clients could socialize, participate in events, and learn how to conduct day-to-day activities. The events included birthday parties, arts and crafts sessions, cooking classes, music lessons, other educational pursuits, etc. Breakfast, lunch, and snacks were served at the daycare.

Ultimately, A-1 was responsible for ensuring clients' physical, emotional, and mental needs were met and that clients developed as appropriate. This was true even though Medicaid payments to A-1 for a given client did not always cover all of A-1's expenses for that client. In such instances, either (1) the client contributed to the excess expenses from their salary (if they held a job) and/or Social Security disability payments they received (if any), or (2) A-1 covered the excess expenses and was not reimbursed.[6]

---

[6] Because some clients were unable to open and/or maintain their own bank accounts, A-1 set up "holding accounts" to facilitate receipt of client salary and/or Social Security disability payments. Little information was provided regarding the operation of the holding accounts, how much money was deposited into them, or what amounts of funds were transferred to A-1. One witness (hired by petitioner, in part, to review A-1's financial information) estimated that A-1 received $60,000 to $70,000 from such holding accounts each year at issue, which was small relative to A-1's gross receipts of over $6 million for each year at issue. Considering the lack of evidence provided with respect to the holding accounts, we cannot determine the amounts deposited into, or

[*5] II.    *Petitioner's Family*

Petitioner and Timothy Branch, Sr., married on October 14, 2015, and remained married during the remainder of the years at issue. This was their second marriage; they were previously married to each other from May 1994 to March 2010.

Petitioner had three children. The eldest, Timothy Branch, Jr.,[7] was a college student during the years at issue but also worked for A-1. The middle child, C.B.,[8] worked for A-1 in addition to attending high school and college. The youngest child, S.B., started working for A-1 around 2017 (presumably, while she attended high school).

C.B. attended John Curtis Christian School (JCCS) during 2015, 2016, and a portion of 2017. Petitioner made payments (some of which were charitable donations[9]) to JCCS from A-1's operating bank account (A-1's bank account), from a personal bank account that petitioner jointly held with her husband (petitioner's joint bank account), and with a personal American Express card account (petitioner's personal American Express card). Petitioner's husband and son were each authorized users on petitioner's personal American Express card.

In addition to her children, petitioner had other relatives who worked for A-1. Petitioner's father, a former university music professor, was one of several musicians who taught music lessons at A-1's daycare. Petitioner's niece was a dietician who planned meals for A-1's clients. Other relatives worked as client caretakers and/or provided general services. A-1 also employed numerous persons who were not relatives of petitioner.

Multiple businesses were registered to petitioner's husband during the years at issue, including Tim's Soul Food & Poor Boy's, LLC (Tim's Soul Food), and Sadie's Seafood, LLC (Sadie's Seafood). The food served at A-1's daycare was prepared by Tim's Soul Food and Sadie's

---

withdrawn from, them. Similarly, we cannot determine (as respondent suggested in his briefs) that any such deposits or withdrawals represented income to A-1 or reimbursements to A-1 for expenses paid.

[7] To avoid confusion, we will mostly refer to Timothy Branch, Sr., as petitioner's husband and to Timothy Branch, Jr., as petitioner's son.

[8] It is the policy of this Court not to identify minor children. We refer to them by their initials. *See* Rule 27(a)(3).

[9] The terms "contribution" and "donation" are used interchangeably in this Opinion.

[*6] Seafood. Both Sadie's Seafood and Tim's Soul Food were at one time restaurants open to the public, but they ceased such operations at unestablished times during or after 2015.[10]

III.  *Petitioner's Tax Issues and the Parties' Stipulations*

Although A-1's work was commendable, petitioner's recordkeeping and tax compliance were not ideal. In addition to paying some A-1 business expenses from A-1's bank account, petitioner (1) paid some of A-1's expenses from petitioner's joint bank account and with her personal American Express card and (2) made some personal payments from A-1's bank account. Furthermore, (1) petitioner's/A-1's records presented to the Court were often incomplete and/or lacked detail, and (2) petitioner did not present records supporting certain business expenses claimed, including records supporting business use of vehicles.

Bruce Thornton, a former Internal Revenue Service (IRS) employee, provided bookkeeping and return preparation services for petitioner and A-1. Allegations regarding advice Mr. Thornton gave to petitioner will be discussed *infra* OPINION Part VI.

Petitioner did not file her 2014 return until April 2016. The Commissioner examined that return and issued petitioner a notice of deficiency pertaining to 2014 alone. Petitioner timely petitioned this Court in response, and the case was settled, with a Stipulated Decision entered June 3, 2022. *See Branch v. Commissioner*, Docket No. 7213-20.

Petitioner did not file returns for the years at issue. In 2019 respondent prepared SFRs for the years at issue. For each year at issue respondent included Schedule C income of over $6 million resulting from A-1's receipt of Medicaid payments. Respondent also (1) included much smaller items of taxable income (such as retirement account distributions, capital gains, dividends, and interest); (2) allowed petitioner a standard deduction for each year; (3) credited petitioner for small amounts of tax withheld for 2015 and 2017; (4) listed petitioner's filing status as single; and (5) added additions to tax pursuant to sections 6651(a)(1) and (2) and 6654.

---

[10] A check paid from petitioner's joint bank account dated November 10, 2015, was made out to "KGLA" and the memo line reads "Ads for Sadie's." Earlier 2015 checks were also made out to KGLA with memo lines reading "Sadie's & Tim's" and "Sadie's Seafood." Considering these checks, we find that Sadie's Seafood and Tim's Soul Food were open to the public during at least part of 2015.

**[\*7]** On January 7, 2020, respondent issued petitioner a Notice of Deficiency setting forth his determinations as stated in the SFRs for the years at issue. Petitioner resided in Louisiana when she filed a Petition with this Court. The Petition mailed to the Court was timely postmarked on April 6, 2020.

At various times beginning in April 2020, petitioner submitted to the IRS proposed returns for the years at issue (three total, one for each year at issue). On each of the three proposed returns petitioner claimed head of household filing status. The IRS did not process any of the proposed returns as filed returns. Petitioner later provided respondent's counsel with revised "draft" returns for the years at issue, each of which reported petitioner's filing status as married filing joint. The draft returns were not filed with the IRS, and each one is marked by petitioner as "Do not file" or "Do not mail." Petitioner's husband did not sign any of the proposed or draft returns, nor did he file his own return for any of the years at issue.

While the exact amounts varied, on each proposed and draft return petitioner reported Schedule C gross receipts for A-1 close to the Schedule C gross receipts determined by respondent for the relevant year at issue. However, petitioner reported Schedule C expenses and (on some of the proposed and draft returns) itemized deductions that resulted in far smaller tax liabilities than those respondent determined. The proposed and draft returns did not include separate Schedules C for, nor any income or expenses pertaining to, the businesses registered to petitioner's husband.

Before trial the parties stipulated that (1) A-1's gross receipts were $6,571,989 for 2015, $6,502,372 for 2016, and $6,789,616 for 2017;[11] and (2) petitioner had non-Schedule C items of taxable income

---

[11] In April 2024 the parties stipulated that "[i]n tax year 2017, A-1 . . . earned gross receipts in the amount of $6,789,616.00." In May 2025 the parties stipulated a bank deposits analysis (performed by a person working for petitioner) that reflected 2017 total deposits to A-1's bank account of $6,876,671 and 2017 total debits from A-1's bank account of $6,869,477. The parties did not stipulate the correctness of that bank deposits analysis. In Pretrial Memoranda respondent stated that the correct amount of A-1's gross receipts for 2017 was $6,789,616 while petitioner stated that the correct amount was $6,869,477 (erroneously referencing the total debits shown in the 2017 bank deposits analysis instead of the total deposits). The parties reversed themselves on brief, with respondent asserting agreed gross receipts of $6,869,477 (and citing the April 2024 stipulation in support, even though that stipulated amount was only

[*8] totaling $11,124 for 2015, $1,979 for 2016, and $3,478 for 2017. There is no remaining dispute about the amounts of A-1's gross receipts or petitioner's non-Schedule C income for the years at issue.[12]

Considering petitioner's proposed and draft returns and supporting records she produced, respondent agreed (by stipulation and concessions before trial) that petitioner is entitled to Schedule C business expense deductions for A-1 of $4,901,421 for 2015, $5,014,311 for 2016, and $5,196,898 for 2017.[13] Petitioner claimed that A-1 is entitled to additional expense deductions totaling $926,720 for 2015, $1,071,475 for 2016, and $1,500,849 for 2017. Respondent argued that

---

$6,789,616) and petitioner asserting "Stipulated Gross Income" of $6,789,616. Neither party addressed the discrepancy.

The discrepancy between the total deposits of $6,876,671 identified in the bank deposits analysis and the $6,789,616 gross receipts figure stipulated by the parties appears to relate mostly to transfers into A-1's bank account from accounts in the names of petitioner's children. During the years at issue petitioner paid/transferred approximately $850,000 total from A-1's bank account to accounts in the names of her children. During 2017, $79,000 was transferred back to A-1's bank account from accounts in the names of petitioner's children. It appears that the $79,000 and certain other small deposits into A-1's bank account were (apparently mistakenly) included as gross receipts in the 2017 bank deposits analysis completed for petitioner/A-1.

Generally, a stipulation is binding on the parties, and we are bound to enforce it. Rule 91(e); *Stamos v. Commissioner*, 87 T.C. 1451, 1454 (1986). Rule 91(e) provides an exception by permitting relief from the binding effect of a stipulation where justice so requires. We generally enforce stipulations unless "manifest injustice" would result. *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1547 (9th Cir. 1987), *aff'g* T.C. Memo. 1986-23; *see also Keenan v. Commissioner*, T.C. Memo. 2018-60, at *5. Absent manifest injustice, we "will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part." Rule 91(e). Considering the gross receipts discrepancy and the facts surrounding it, especially the lack of agreement between the parties as to the correctness of the bank deposits analysis, we will enforce the April 2024 stipulation.

[12] In his Opening Brief, respondent claimed that approximately $174,000 in low-income housing payments and $50,000 in unidentified other payments were deposited into petitioner's joint bank account during the years at issue. Respondent claimed that these deposits "indicat[ed] there were other business operations outside of A-1" but did not argue that we should find petitioner to have received taxable income as a result of the deposits.

[13] The figures in this sentence are based on amounts set forth in respondent's Pretrial Memorandum filed in August 2025. Figures in respondent's filings occasionally suffered from minor scrivener's and/or math errors. *See, e.g.*, *infra* note 22. The parties shall attempt to resolve any minor issues resulting from respondent's errors in the Rule 155 computations.

[*9] A-1 is not entitled to deductions for any portion of the additional expenses claimed.

The parties also stipulated that petitioner and/or her husband made "charitable contributions" totaling $70,310 for 2015, $76,484 for 2016, and $67,956 for 2017. Petitioner claimed that she made additional charitable donations other than those stipulated while respondent argued that petitioner is entitled to deductions for only a portion of the stipulated charitable donations. Petitioner also claimed that she is entitled to a Schedule A deduction for state and local taxes paid in 2015, which respondent contested.

OPINION

I.    *Burden of Proof*

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the Commissioner's determinations are incorrect. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving that he or she is entitled to any deduction claimed. *See* Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). A taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must further substantiate that the expense to which the deduction relates has been paid or incurred. *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); *Meneguzzo v. Commissioner*, 43 T.C. 824, 831–32 (1965). A taxpayer is required to maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* § 6001; Treas. Reg. § 1.6001-1(a). Such records must substantiate both the amount and purpose of the related expense. *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001).

Under section 7491(a), the burden of proof may shift to the Commissioner as to any relevant factual issue if the taxpayer produces credible evidence with respect to that issue and meets other requirements. Credible evidence is the quality of evidence which, after critical analysis, a court would find sufficient on which to base a decision on the issue if no contrary evidence were submitted. *Baker v. Commissioner*, 122 T.C. 143, 168 (2004) (citing *Higbee*, 116 T.C. at 442). The parties dispute whether petitioner has met the requirements of section 7491(a) to shift the burden of proof to respondent with respect to

**[\*10]** the issues in dispute. We need not decide which party is correct for each issue. We decide most issues on the basis of the preponderance of the evidence and need not decide which party bears the burden of proof for such issues. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. For the issues we decide on the basis of the burden of proof, we rule that petitioner failed to introduce credible evidence with respect to such issues and therefore failed to satisfy the requirements of section 7491 to shift the burden of proof to respondent.

## II.    *Respondent's Use of Certain Materials Not Part of the Record*

Several times in his Opening Brief, respondent asserted facts based on materials not part of the record. Such materials included photos of properties on Google Maps (using the Street View feature), internet reviews of certain restaurants, and other internet sources/websites. Respondent did not attempt to introduce such materials into evidence, nor did he use them for any other purpose during trial (such as refreshing a witness's recollection). Instead, respondent requested in his Opening Brief that we take judicial notice of facts he alleged based on the materials.

Under section 7453, the Federal Rules of Evidence (Fed. R. Evid.) apply to the proceedings in this case. Rule 143(a); *Estate of Shafer v. Commissioner*, 80 T.C. 1145, 1151 (1983), *aff'd,* 749 F.2d 1216 (6th Cir. 1984). Fed. R. Evid. 201(b) provides that "court[s] may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Considering the facts alleged and the materials at issue, we find neither prong to be satisfied. Accordingly, we decline to make factual findings based on any of the materials in question.

## III.    *Petitioner's Filing Status and Community Property Issue*

In the Notice of Deficiency respondent determined that petitioner's filing status was single. On brief respondent claimed that petitioner's filing status should be married filing separate, given that she was married at the end of each year at issue and she and her

[*11] husband did not file valid joint returns.[14] We agree. Taxpayers can secure joint filing status only by filing a joint tax return. § 6013(a); *see* Treas. Reg. § 1.6013-1(a). However, petitioner and her husband did not file a valid joint return for any of the years at issue. Therefore, we hold that petitioner's filing status for each of the years at issue was married filing separate.

Petitioner did not address her filing status in her Opening Brief. In her Answering Brief, petitioner did not dispute respondent's position that her filing status should be married filing separate. However, for the first time, petitioner argued that she was "married in a community property state. There has been no evidence to support the allocation of th[e] income [in dispute] as separate property under IRC § 66 or otherwise. Any income earned by Petitioner or A-1 . . . should be allocated one-half to Petitioner and one-half to her spouse." Petitioner is correct that Louisiana is a community property state. *See* La. Civ. Code Ann. art. 2334. We have recognized that "[m]arried persons who reside in a community property State are generally each required to report one-half of their community income for Federal income tax purposes." *Shea v. Commissioner*, 112 T.C. 183, 189 (1999) (first citing *United States v. Mitchell*, 403 U.S. 190 (1971); and then citing *Drummer v. Commissioner*, T.C. Memo. 1994-214, *aff'd*, 68 F.3d 472 (5th Cir. 1995) (unpublished table decision)).

We may consider an issue raised for the first time in a party's answering brief to be abandoned and conceded. *See Dutton v. Commissioner*, 122 T.C. 133, 142 (2004) ("Our practice is not to consider new issues raised for the first time in an answering brief."); *Krause v. Commissioner*, 99 T.C. 132, 177 (1992), *aff'd sub nom. Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir. 1994). Here, petitioner failed to raise the community income issue before or during trial, or even in her Opening Brief. Petitioner has not shown the amount, if any, of the income earned by her husband, which might affect the amount of income taxable to petitioner.[15] In addition, petitioner neither argued nor

---

[14] It appears that petitioner did not prove to respondent that she was married during the years at issue until shortly before trial. The day before the trial began, petitioner filed various proposed exhibits, one of which included a Certificate of Marriage reflecting her marriage in October 2015.

[15] In his Opening Brief respondent stated that he "is treating A-1 . . . as petitioner's separate property from her husband. Likewise, [petitioner's husband's] business ventures [are being treated as] separate from petitioner based on the limited information available from petitioner." Considering the limited facts established by

**[\*12]** established how income she and her husband earned in 2015 should be divided, considering they married on October 14, 2015. *See Adams v. Commissioner*, 82 T.C. 563, 567–70 (1984) (discussing division of community income when taxpayers were married for only a portion of a year). Finally, petitioner's failure to timely raise the community income issue precluded respondent from establishing facts relevant to section 66(b) (regarding otherwise community income being included in only one spouse's income for tax purposes in certain instances) for any of the items of income at issue. In view of the circumstances, we consider petitioner to have conceded the community income issue.

## IV.    *Schedule A Deductions*

### A.    *2015 State and Local Taxes*

Petitioner claimed that she is entitled to a 2015 Schedule A deduction for state and local taxes paid of $20,095. In support of her claim, petitioner cited two checks totaling $20,095, paid from petitioner's joint bank account to the Louisiana Department of Revenue in May 2015. The memo line for one check reads "2012 LDR," and the memo line for the other check reads "2013 State Tax [illegible]." Both checks were signed by petitioner. Respondent does not contest that the payments were made but argues that "it is unclear whether these payments from [petitioner's joint bank account] were expenses for an unrelated business or state income tax obligation. There is simply not enough information on the record to substantiate this claimed deduction."

Both parties could have done more to develop facts regarding the state tax payments at issue. However, the evidence presented favors petitioner. Although the checks were paid from a joint bank account, they were signed by petitioner and paid before petitioner and her husband were married in October 2015. Although petitioner and her husband were previously married, that marriage ended in March 2010. Thus, petitioner and her husband were not married at any time relevant to the state tax payments. Furthermore, there is no indication that the payments pertain to business taxes. Considering the evidence presented, we rule that petitioner is entitled to a 2015 Schedule A deduction for state and local taxes paid of $20,095.

---

petitioner regarding her husband's businesses and her failure to timely raise arguments regarding community income, we find respondent's treatment to be appropriate.

**[\*13]** B.    *Charitable Donations*

In their First Stipulation of Facts, filed in May 2025, the parties stipulated:

In 2015, petitioner, either through [petitioner's joint bank] account or [A-1's bank] account, made donations to [JCCS] in the following amounts:

a. $2,500.00 on March 6, 2015 from [A-1's bank] Account.

b. $1,000.00 on April 24, 2015 from [A-1's bank] Account.

c. $3,000.00 on April 30, 2015 from [A-1's bank] Account.

d. $43,610.00 on May 26, 2015, from petitioner's joint [bank] account for 2015–2016 tuition. The check totaled $52,490.00 and included the tuition for petitioner's minor son, C.B., for the 2015–2016 school year.[16]

e. $7,200.00 on July 21, 2015 from [A-1's bank] Account.

f. $6,000.00 on September 30, 2015 from petitioner's joint [bank] account.

g. $7,000.00 on December 8, 2015 from [A-1's bank] Account.

The parties further stipulated that "[a] total of $70,310.00 of charitable contributions were made to [JCCS] in 2015."

In the First Stipulation of Facts, the parties similarly listed charitable donations made to JCCS during 2016. The parties stipulated that "[a] total of $76,484.00 of charitable contributions were made to [JCCS] in 2016."

---

[16] This paragraph is not well written. The parties indicated that $43,610 of the payment was for tuition, though it is clear from the total charitable donations the parties stipulated that $43,610 of the payment was a charitable donation.

**[\*14]** In the First Stipulation of Facts, the parties similarly listed charitable donations made to JCCS during 2017 totaling $62,756. In addition, the parties stipulated that "[p]etitioner and [her husband] contributed $1,500.00 to St. Augustine Church . . . on April 5, 2017 from [petitioner's] joint [bank] account" and that "[p]etitioner contributed $3,700.00 to All4One Society . . . on December 7, 2017 from [petitioner's] joint [bank] account." Adding up the listed donations to JCCS, St. Augustine Church, and All4One Society, the parties stipulated that "[a] total of $67,956.00 of charitable contributions were made by petitioner and/or [her husband] in 2017."

In May 2025 respondent filed a Pretrial Memorandum in which he included a section titled "RESOLVED ISSUES."[17] In that section respondent stated:

> Respondent makes concessions as to the following allowable Schedule A deductions:

|  | **2015** | **2016** | **2017** |
|---|---|---|---|
| Sch. A Charitable Contributions | $70,310.00 | $76,484.00 | $67,956.00 |

These are the total charitable donations that the parties stipulated for each year at issue. Nowhere in the Pretrial Memorandum did respondent indicate that the amount of deductible charitable contributions was in any way at issue. In an updated Pretrial Memorandum filed in August 2025, respondent again included the same amount of charitable contributions in a section titled "RESOLVED ISSUES." Respondent further stated that the "charitable contributions were stipulated in the First Stipulation of Facts" and did not indicate that those donations were at issue.

In his Opening Brief, respondent attempted to walk back the concessions reflected in his Pretrial Memoranda. Respondent claimed that he "acknowledged that donations were made by petitioner and/or her husband in the First Stipulation of Facts. However, respondent had not addressed the deductibility of the claimed charitable contributions due to inconsistent statements from petitioner regarding her marital status." (Citations omitted.) Respondent proceeded to argue that certain of the charitable donations listed in the First Stipulation of Facts should

---

[17] The trial in this case was scheduled to begin during the week of June 9, 2025. The trial was later rescheduled for, and commenced on, August 5, 2025.

**[\*15]** be limited because "[p]etitioner's filing status is married filing separate, and she lives in Louisiana, a community property State. For personal expenses paid from a community fund—here the joint account—petitioner is only entitled to half of the allowed charitable contributions paid." (Citations omitted.) Respondent concluded that petitioner was entitled to charitable contribution deductions totaling only $45,505 for 2015, $67,034 for 2016, and $47,232 for 2017.[18]

Considering the statements made in respondent's Pretrial Memoranda, we will hold respondent to his concession that petitioner is entitled to itemized deductions for 100% of the charitable donations listed in the First Stipulation of Facts. At the time each Pretrial Memorandum was filed, respondent was aware that petitioner was or may have been married to Timothy Branch, Sr., during the years at issue. Respondent was also aware that many of the donations were made from petitioner's joint bank account. Timothy Branch, Sr.'s name appears on each joint bank account statement and each check written against that account. In spite of these facts, respondent stated that the amounts of "Sch. A Charitable Contributions" were part of the "RESOLVED ISSUES." Had respondent properly indicated that petitioner might be entitled to deduct only 50% of certain donations made, petitioner might have introduced evidence to the contrary.

We must also address additional payments not listed in the First Stipulation of Facts (additional donations) that petitioner claimed constitute deductible donations. In May 2025, petitioner filed a Pretrial Memorandum that did not mention charitable contribution deductions. In an updated Pretrial Memorandum filed in August 2025, petitioner listed "Donations" totaling $97,900 for 2015, $19,000 for 2016, and $39,654 for 2017. Petitioner cited specific payments in support of the alleged donations she listed, though most of the payments were included in the charitable donations stipulated by the parties. In her Opening

---

[18] Respondent determined the 2015 and 2016 figures by starting with the charitable donations listed in the First Stipulation of Facts and allowing petitioner (1) 100% of donations made from A-1's bank account and (2) 50% of donations made from petitioner's joint bank account. A chart in respondent's Opening Brief shows that he employed a similar method for 2017 but mistakenly omitted the $3,700 donation to All4One Society rather than allow petitioner a deduction for 50% of the donation.

**[\*16]** Brief, petitioner claimed the same total "Donations" set forth in her updated Pretrial Memorandum and cited the same payments.[19]

Respondent argued that petitioner failed to substantiate the deductibility of any additional donations. Reviewing the evidence, we agree with respondent. While petitioner cited checks showing payments made, she failed to substantiate that those payments were deductible donations.

Section 170(a)(1) allows a deduction for contributions to charitable organizations defined in section 170(c). Section 170(f)(8) provides substantiation requirements for certain charitable contributions. Specifically, section 170(f)(8)(A) provides: "No deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)." For donations of money, the donee's written acknowledgment must state the amount contributed, indicate whether the donee organization provided any goods or services in consideration for the contribution, and provide a description and good-faith estimate of the value of any goods or services provided by the donee organization. *See* § 170(f)(8)(B); Treas. Reg. § 1.170A-13(f)(2).

Most of the additional donations petitioner claimed pertain to payments made to JCCS. However, petitioner has not shown that payments to JCCS (above those identified as charitable donations in the First Stipulation of Facts) were charitable donations rather than tuition or another type of nondeductible payment. Petitioner also failed to provide written acknowledgment of the alleged donations above $250 as required under section 170(f)(8).

Three of the four remaining additional donations petitioner claimed were made to NOLA Hope in 2015, Metairie Basketball in 2015, and Tiffany Joseph in 2017. Petitioner failed to substantiate that any payments to these three organizations/people were charitable donations.

---

[19] For an unclear reason, petitioner included many of the charitable donations listed in the First Stipulation of Facts but omitted others. However, petitioner cited paragraphs in the First Stipulation of Facts that listed charitable donations made and claimed that she should be given credit for all of the donations listed therein. We do not interpret petitioner's filings to concede any charitable donations listed in the First Stipulation of Facts.

**[\*17]** Petitioner also failed to provide written acknowledgment of alleged donations above $250 as required under section 170(f)(8).

The final additional donation petitioner claimed was $1,500 contributed to St. Augustine Church by check dated March 1, 2017, and paid from petitioner's joint bank account on March 8, 2017. In the First Stipulation of Facts, the parties stipulated that "[p]etitioner and [her husband] contributed $1,500.00 to St. Augustine Church . . . on April 5, 2017, from [petitioner's joint bank] account." We see no indication in petitioner's joint bank account statements that such a donation was made on or around April 5, 2017. We believe that the parties erred in their stipulation, and that the $1,500 donation made to St. Augustine Church in early March 2017 is the donation that the parties attempted to stipulate. As discussed *supra*, we have already allowed petitioner a $1,500 deduction for a donation to St. Augustine Church during 2017 in accordance with the stipulation. Petitioner failed to provide a written acknowledgment of any additional $1,500 donation as required under section 170(f)(8).

V.  *Schedule C Deductions*

As previously stated, respondent agreed that petitioner was entitled to Schedule C business expense deductions for A-1 of $4,901,421 for 2015, $5,014,311 for 2016, and $5,196,898 for 2017. Petitioner claimed that A-1 is entitled to deduct additional expenses totaling $926,720 for 2015, $1,071,475 for 2016, and $1,500,849 for 2017. For the reasons discussed *infra*, we hold that A-1 is entitled to deduct a portion of the additional expenses claimed.

A.  *Business Expense Deductions in General*

Pursuant to section 162(a), a taxpayer may deduct all ordinary and necessary expenses paid during the taxable year in carrying on any trade or business. An expense is ordinary if it is normal, usual, or customary within a particular trade, business, or industry or arises from a transaction of common or frequent occurrence in the type of business involved. *Deputy v. du Pont*, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business. *Welch v. Helvering*, 290 U.S. at 113. Ordinary and necessary business expenses do not include nondeductible personal, living, or family expenses. Treas. Reg. § 1.162-17(a); *see* § 262(a). Whether an expenditure satisfies the requirements of section 162 is a question of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943).

**[\*18]** When a taxpayer claims a deduction but cannot fully substantiate the underlying expense, in certain circumstances we may approximate the allowable amount, "bearing heavily . . . upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). Even where the taxpayer has failed to keep records of deductible expenditures, we have discretion in appropriate circumstances to estimate those expenditures where there is evidence that deductible expenses were incurred. *Id.*; *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). But we are not required to guess at a number; rather "we must have some basis on which an estimate may be made." *Vanicek*, 85 T.C. at 743. On the record before us, we find that it is appropriate to apply the *Cohan* rule to certain of the disputed expense deductions, discussed further *infra*.

Under section 274(d), certain categories of deductions, including deductions with respect to certain vehicle, travel, and other expenses, are subject to strict substantiation requirements. *See* § 280F(d)(4). Section 274(d) provides that no deduction shall be allowed for these expenses unless the taxpayer substantiates the amount, time and place, business purpose, and business relationship to the taxpayer of the person receiving the benefit for each expenditure by adequate records or sufficient evidence corroborating the taxpayer's own statements. We may not apply the *Cohan* rule to approximate expenses covered by section 274(d). *See Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969).

For meals not connected with travel, taxpayers may claim a deduction for food and beverages provided the expense "is not lavish or extravagant under the circumstances" and "the taxpayer (or an employee of the taxpayer) is present at the furnishing of such food or beverages." § 274(k)(1). Such deductions are generally limited to 50% of the amount paid. § 274(n). Similarly, deductions for entertainment expenses are generally limited to 50% of the amount paid. *Id.* Respondent did not argue that the section 274(k) and/or (n) limitations apply to any of the expenses at issue in this case. In addition, petitioner argued that no expenses at issue meet the definition of "entertainment" set forth in Treasury Regulation § 1.274-2(b).[20] Respondent made no counterargument regarding that regulation, nor did he identify entertainment or meal expenses in the evidence to which section 274 might apply. We also note that there are numerous exceptions to the

---

[20] As defined in Treasury Regulation § 1.274-2(b)(1)(i), "entertainment" includes certain food and beverage expenses.

**[\*19]** section 274(k) and (n) limitations, *see* § 274(k)(2), (n)(2), certain of which might apply in this case.[21] Considering the circumstances, we find respondent to have waived any argument regarding the section 274(k) and/or (n) limitations.

In her Opening Brief, petitioner claimed that "[t]he receipts [she] provided at trial and presented as Exhibits were just samples of the receipts that were kept, contemporaneously, in [A-1's] files. The total documentation and receipts associated with [A-1's] receipts and expenditures were too voluminous to be produced." However, it was incumbent upon petitioner to produce all documentation supporting her claimed business expenses. As we stated in *Smith v. Commissioner*, T.C. Memo. 1981-371, 1981 Tax Ct. Memo LEXIS 372, at \*15, *aff'd*, 698 F.2d 1236 (11th Cir. 1983) (unpublished table decision), "[t]hose amounts which we can not identify or estimate confidently as deductible items we must disallow. 'We can not assume what might be proven by evidence which was not introduced.' *Lyon v. Commissioner*, 1 B.T.A. 378, 380 (1925)." *See also Stonegate of Blacksburg, Inc. v. Commissioner*, T.C. Memo. 1974-213, 1974 Tax Ct. Memo LEXIS 106, at \*11 (stating that when a party claims additional records within its control exist, but fails to introduce them into evidence, "we must presume that no such records exist" (citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947))).

### B.    *Petitioner's Organization of Claimed Additional Expenses*

For each year at issue, petitioner divided the additional expenses she claimed into groups and subgroups. For most, but not all, of the groups/subgroups, petitioner listed each payment made that she asserted fell into the group/subgroup. Some of the groups/subgroups included numerous types of alleged expenses. For example, one 2015 group was for assorted expenses paid using petitioner's personal American Express card. This group included payments made to restaurants, clothing stores, sporting goods stores, hotels, home improvement stores, transportation and vehicle services, etc.

---

[21] For example, there is an exception for "[e]xpenses for goods or services" sold by a taxpayer to customers in a bona fide transaction for an adequate and full consideration. § 274(e)(8), (k)(2), (n)(2). A-1's provision of meal and entertainment goods/services to its clients may satisfy this requirement because A-1 was paid to provide such goods and services. Had respondent argued that the section 274(k) and/or (n) limitations apply, petitioner might have argued that this and/or other exceptions are applicable.

[*20] To avoid confusing the parties, we will organize our discussion around the groups and subgroups petitioner used for each year at issue.

### C.     *2015 Additional Expenses*

#### 1.     *Rent*

The parties did not clearly identify the total 2015 rent expenses in dispute. In her August 2025 Pretrial Memorandum and her Opening Brief, petitioner stated that $108,330 in claimed rent expenses was in dispute. However, the rent subgroup payments petitioner listed (discussed *infra*) totaled only $59,060. Both parties failed to address this discrepancy. The discrepancy appears to pertain to certain expenses identified in a financial analysis that a witness for petitioner assembled. In his financial analysis, the witness included rent expenses for "Client Rent," "A1 Rent (OakWood, LaPalco, Day Hab, Region 3)," "Emergency Housing," and "Furniture (Houston Emergency Housing)." The witness's financial analysis did not specify individual payments that made up these alleged rent expenses, and the witness's tally of total rent expenses ($223,769) does not seem to match total rent expenses petitioner claimed on brief (apparently $251,485, of which respondent conceded $143,155). Other than payments specifically identified in her Pretrial Memorandum and her Opening Brief, we are left guessing as to what exact payments petitioner claimed to be deductible rent expenses.

For his part, in his Opening Brief respondent stated that total rent expenses claimed by petitioner were $251,485, that respondent had conceded $143,155, and that $108,330 remained in dispute.[22] However, respondent attempted to walk back a portion of his 2015 rent expense concession. Respondent claimed that petitioner operated a café, The Dat's Eatery, separately from A-1. Respondent stated that he "believe[ed] that some stipulated expenses paid to 'Novel Pay' for rent of property . . . could be attributed to The Dat's Eatery." We reject respondent's attempt to walk back his rent expense concessions totaling $143,155 as being untimely, in addition to being ill supported.[23]

---

[22] Oddly, respondent's May 2025 Pretrial Memorandum stated that respondent conceded rent expenses totaling $150,430, and respondent's August 2025 Pretrial Memorandum stated that respondent conceded rent expenses totaling $147,155. The discrepancies appear to be the result of scrivener's and/or math errors. Respondent did not explain the inconsistencies in his Opening Brief.

[23] Respondent tried to walk back a portion of his 2016 rent expense concessions on the same grounds. We also hold respondent to his 2016 rent expense concessions.

**[\*21]** Regarding the rent expenses in dispute, considering the evidence and filings, we will primarily discuss the $59,060 in rent subgroup payments listed by petitioner. With one exception (discussed *infra* OPINION Part V.C.1.b) petitioner failed to sufficiently argue or establish that additional, unlisted rent expenses that are part of the $108,330 allegedly in dispute are deductible.

a.    *Rent Subgroup: A-1 Rent*

Petitioner claimed A-1 is entitled to a $28,500 deduction for rent paid from petitioner's joint bank account for two buildings.

Four rent payments totaling $12,000 were made for a building in or near the New Orleans French Quarter. Petitioner briefly testified that A-1 intended to turn the rented space into a job training facility for A-1's clients. Petitioner further testified that significant building repairs were needed to accomplish this, but they were not completed and the facility never became operational. Petitioner failed to support her claims with documentary evidence. Considering the paucity of evidence presented, we rule that petitioner failed to meet her burden of proof to show that the $12,000 paid represented an ordinary and necessary business expense for A-1.

Eleven rent payments totaling $16,500 were made for the building that Tim's Soul Food operated out of (Tim's Soul Food building). Although Tim's Soul Food (along with Sadie's Seafood) prepared the food served at A-1's daycare, there is no evidence that they were part of the same business. Tim's Soul Food was once a restaurant open to the public. Though it eventually ceased such operations, the time it did so was not established. The evidence presented supports a finding that rent payments made for the Tim's Soul Food building are not an ordinary and necessary business expense for A-1, and we rule accordingly.

b.    *Rent Subgroup: Emergency Rent*

Petitioner claimed A-1 is entitled to a $29,560 deduction for rent paid from petitioner's joint bank account for two apartments.

Twelve rent payments totaling $23,865 were made for an apartment in New Orleans. Petitioner briefly testified that the apartment was rented for potential emergency use and was vacant during the years at issue. When asked to explain why the apartment was rented, petitioner gave a rambling answer that began: "It was in New Orleans. It was just—I mean, it was no rhyme or reason. It was

[*22] just an apartment in New Orleans . . . ." We do not find this testimony compelling, and petitioner failed to otherwise substantiate A-1's business use of the apartment. Accordingly, we rule that petitioner failed to meet her burden of proof to show that the $23,865 paid represented an ordinary and necessary business expense for A-1.

Petitioner listed two rent payments totaling $5,695 for an apartment in Houston, Texas (Houston apartment). However, our review of the record shows that an additional payment of $2,630 was made in August 2015 but not included in petitioner's list. Unlike her testimony with respect to the New Orleans apartment, petitioner's testimony with respect to the Houston apartment was detailed and credible. Petitioner testified that Houston is a logical city to evacuate to because of its proximity to New Orleans and abundance of hotel rooms for clients. Petitioner also described why it is not ideal for A-1's high-level business operations to be run out of a hotel. It is sensible that a business such as A-1 would maintain the Houston apartment to be used in case of a natural disaster in New Orleans, and we rule that rent paid for that apartment (including the $2,630 payment not listed by petitioner) are ordinary and necessary business expenses for A-1.

c.      *Rent Subgroup: Emergency Utilities*

Petitioner claimed A-1 is entitled to a $1,000 deduction for a utility payment made for the Houston apartment. We have ruled that the rent payments for the Houston apartment are deductible business expenses. We similarly rule that the utility payment is a deductible business expense.

2.      *Utilities*

Petitioner claimed A-1 is entitled to a $49,270 deduction for various utilities paid from petitioner's joint bank account. Such payments were mostly for electricity, though some were for phones, cable, and water. Petitioner testified that these expenses pertained to client and/or employee housing but provided limited documentary evidence supporting the deductibility of the claimed expenses.

We find it credible that most of the contested utility expenses pertained to clients or employees and were ordinary and necessary business expenses for A-1. However, petitioner failed to fully substantiate the deductibility of the $49,270 paid. Under the circumstances, we find it proper to apply the *Cohan* rule to estimate the portion of the utility expenses that is deductible by A-1, weighing

**[\*23]** against petitioner. *See Cohan v. Commissioner*, 39 F.2d at 543–44. Considering A-1's business, the amounts and types of utility expenses paid, the number of separate payments, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $35,000 (approximately 70%) represents deductible business expenses for A-1.

### 3. *Contractors*

#### a. *Contractor Subgroup: Contractor Checks*

Petitioner claimed A-1 is entitled to a $49,931 deduction for various checks paid from petitioner's joint bank account. The checks were paid to various people and entities, including petitioner's father and a repair company. Petitioner discussed several of the payees during her testimony. However, others were not described; and the only evidence regarding their payments is general testimony about contractors, some receipts, and check copies that typically have general memo line descriptions (i.e., "computer") or no completed memo line at all.

We found petitioner's testimony regarding A-1's use of contract labor for many tasks to be credible. However, petitioner failed to fully substantiate the deductibility of the $49,931 paid. Under the circumstances, we find it proper to apply the *Cohan* rule to estimate the portion of the payments deductible by A-1. Considering A-1's business, the payees, the amount of the checks paid, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $35,000 (approximately 70%) represents deductible business expenses for A-1.

#### b. *Contractor Subgroup: Additional Expenses*

Petitioner claimed A-1 is entitled to a $466,800 deduction for payments made to various people and entities from A-1's bank account. Most of the payments were made to people, many of whom are, or appear to be, employees of A-1 or contractors who performed work for A-1. A few of the payments were made to payees including Academy Sports, Sam's Club, Target, Home Depot, Urban Outfitters, Forever 21, restaurants, car service/gas stations, a car rental company, and "Travel Reservation." There were also cash withdrawals from the account and a check paid to cash.

**[\*24]** We recognize that a company such as A-1 may incur numerous types of expenses in the operation of its business. The testimony of petitioner and other witnesses generally supported the deductibility of a wide range of expenses.[24] However, petitioner failed to fully substantiate the deductibility of the $466,800 paid. We make several rulings regarding this subgroup.

First, petitioner failed to satisfy the strict substantiation requirements of section 274(d) for certain vehicle and travel expenses totaling $8,843. These expenses include a $7,000 payment to Tiffany Joseph for "Transportation Reimbursement." We rule that no part of those expenses is deductible.

Second, cash withdrawals (and a check paid to cash) total $21,871. In support of cash expenses, petitioner cites (1) testimony that A-1 gave some clients cash allowances and/or gave clients small amounts of cash when they were out with A-1 caretakers in the community and (2) receipts showing A-1's disbursement of (generally small amounts of) cash to clients and caretakers. While it is clear that A-1 used petty cash in its operations, cash is fungible; and it is difficult to say what portion of the cash withdrawn from A-1's bank account was so used. However, A-1 receipts show that A-1 dispersed approximately $9,000 in cash to clients and caretakers during 2015. Considering the testimony and the specific amounts shown on the receipts, we rule that A-1 is entitled to a deduction of only $9,000 for the substantiated use of petty cash.

Third, respondent has identified payments totaling $10,205 that respondent already conceded. We rule that A-1 is not entitled to duplicative deductions for those payments.

Finally, considering the testimony and documentary evidence, we find it proper to apply the *Cohan* rule to estimate the portion of the remaining $425,881 that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from A-1's bank account, and the testimony/other evidence presented, we rule that $256,000 (approximately 60%) represents deductible business expenses for A-1.

---

[24] Respondent correctly noted that many of the expenses at issue were for "personal items." However, petitioner established that A-1 purchased for its clients clothing, medicine, food, home goods, and other items that were personal. Furthermore, the high amount of spending on personal items during the years at issue also suggests that petitioner was not purchasing all such items for her own family.

**[\*25]** This is in addition to the $9,000 deduction for the substantiated use of petty cash.

### 4.    *Transportation*

Petitioner claimed A-1 is entitled to a $3,100 transportation expense deduction regarding a check paid from petitioner's joint bank account to Tiffany Joseph. Nothing was written in the memo line.

Multiple other checks were paid to Tiffany Joseph during the years at issue. The checks include one paid in 2015 from A-1's bank account for $7,100 that has a memo line reading "Transportation Reimbursement." This payment was discussed *supra* OPINION Part V.C.3.b. Another check paid in 2017 from petitioner's joint bank account for $4,000 has nothing written in the memo line. Petitioner claimed that this payment was a charitable contribution, as discussed *supra* OPINION Part IV.B.

Considering that the $3,100 check was paid from petitioner's joint bank account and has no memo line, as well as the limited additional information in the record regarding Tiffany Joseph, we rule that petitioner failed to meet her burden of proof to show that the payment represented an ordinary and necessary transportation expense for A-1. This is the case regardless of whether the strict substantiation requirements of section 274(d) apply to the payment.

### 5.    *Depreciation*

Section 167(a) "allow[s] as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear" of property used in a trade or business or held for the production of income. Petitioner claimed A-1 is entitled to a $103,199 deduction for depreciation.[25] The assets shown on the 2015–17 depreciation schedule included real properties (subtracting alleged underlying land value) as well as two unspecified

---

[25] Petitioner's claims regarding depreciation deductions for the years at issue were based on a depreciation schedule that she created and introduced into evidence (2015–17 depreciation schedule). We found the formatting of the 2015–17 depreciation schedule to be somewhat confusing. Apparently, so did petitioner. In her Opening Brief petitioner claimed depreciation deductions of $81,772 for 2015, $82,045 for 2016, and $82,045 for 2017. These amounts represented only a portion of the depreciation for each year at issue shown on the 2015–17 depreciation schedule; total depreciation shown was $103,199 for 2015, $98,577 for 2016, and $91,952 for 2017. We will treat petitioner's claims as if she had asked for the full amount of depreciation shown on the 2015–17 depreciation schedule for each year at issue.

**[\*26]** vehicles. The vehicles appear to be a Ford-450 and a BMW SUV.[26] In support of the claimed depreciation expenses, petitioner argues that

> [t]he 2014 tax year was litigated in the tax court, and the parties hereto reached a settlement for [2014] . . . . Several issues reviewed in the audit of 2014 and settled before this Court directly impact the 2015, 2016, and 2017 tax years. Specifically, the IRS reviewed and accepted Petitioner's depreciable assets and depreciation schedule for 2014, which necessarily affects the treatment of depreciation in subsequent tax years.

Considering petitioner's arguments and the evidence presented, we rule that A-1 is not entitled to any depreciation deduction for 2015.

First, we do not agree with petitioner's argument that the settlement regarding the 2014 year precludes respondent from challenging A-1's claimed depreciation expenses for the years at issue. It appears that depreciation expenses were never at issue in the case involving petitioner's 2014 tax year—the Notice of Deficiency at issue in that case actually allowed petitioner a greater depreciation deduction for A-1 ($46,439) than the amount shown on the 2014 depreciation schedule and reported on the 2014 Schedule C for A-1 ($44,775). Even if depreciation deductions were at issue in the 2014 case, each tax year stands on its own, with each year being the origin of new liability and a separate cause of action. *Koprowski v. Commissioner*, 138 T.C. 54, 60 (2012). This means that the doctrine of res judicata does not apply. *Martin v. Commissioner*, T.C. Memo. 2021-35, at \*22. The doctrine of collateral estoppel serves petitioner no better because, even if the same depreciation issues were present in both the 2014 case and the instant case, they were settled in the 2014 case by stipulated decision, whereas collateral estoppel requires a decision, not just a settlement. *See Sands v. Commissioner*, T.C. Memo. 1997-146, 1997 Tax Ct. Memo LEXIS 171, at \*16–17, *aff'd sub nom. Murphy v. Commissioner*, 164 F.3d 618 (2d Cir. 1998) (unpublished table decision). "It is well settled that the

---

[26] On brief, petitioner claimed that "[t]he vehicles include a Ford F-450 . . . and a BMW." We note that a 2014 depreciation schedule for A-1 introduced into evidence in this case (2014 depreciation schedule) includes a Cadillac Escalade purchased on January 1, 2011, for $55,000. The same 2014 depreciation schedule includes neither the Ford-450 nor the BMW SUV, even though one of these vehicles was allegedly purchased in 2011 and the other on January 1, 2014. There were many inconsistencies, or apparent inconsistencies, such as this between the 2014 depreciation schedule and the 2015–17 depreciation schedule.

**[\*27]** Commissioner's failure to challenge a taxpayer's treatment of an item in one taxable year is irrelevant in the determination of the proper treatment of a similar item in a different taxable year." *Little v. Commissioner*, 106 F.3d 1445, 1453 (9th Cir. 1997), *aff'g* T.C. Memo. 1993-281.

Second, and related to the first point, there are substantial differences in assets shown on the 2014 depreciation schedule and the assets shown on the 2015–17 depreciation schedule. Though real property names/addresses are not included on the 2014 depreciation schedule (all real properties are identified as "house"), few dates placed in service or purchase prices match between the 2014 depreciation schedule and the 2015–17 depreciation schedule. Furthermore, (1) many more real properties are shown on the 2015–17 depreciation schedule than on the 2014 depreciation schedule, and (2) there are various other differences between the depreciation schedules that do not give us confidence in the correctness of the 2015–17 depreciation schedule. *See supra* note 26. Given these differences, we do not find that the settlement regarding petitioner's 2014 tax year supports her claimed A-1 depreciation expenses for the years at issue.

Third, petitioner has provided little to no evidence supporting the 2015–17 depreciation schedule. She has introduced little to no evidence supporting (1) A-1's ownership of the assets in dispute;[27] (2) the claimed purchase prices and/or dates placed in service for assets; (3) for the value of real properties, the portions of basis that petitioner assigned to the value of land (which is not a depreciable asset);[28] or (4) the amount of improvements to buildings that might increase depreciable basis.

---

[27] It was clear that A-1 did not own many of the properties for which depreciation deductions were claimed. Petitioner testified (and rental agreements reflect) that she herself owned several of the properties. Petitioner did not attach to any of the tax returns prepared on her behalf for the years at issue Schedule E, Supplemental Income and Loss, reporting rental property income or expenses. Petitioner also testified that (1) her son owned one of the properties and A-1 paid him rent to use the property, (2) her husband owned one of the properties, and (3) her parents may have owned one of the properties.

[28] For many of the real properties, the portion of basis that petitioner assigned to land (as opposed to buildings/improvements) struck us as unreasonably small. For example, the 2015–17 depreciation schedule includes one property in which A-1 had an alleged basis of $550,000. Petitioner assigned only $14,730 of the property basis to land. Another property was a vacant lot, though the 2015–17 depreciation schedule assigned only 10% of the property basis to land.

**[\*28]** Regarding the vehicles at issue, section 274(d) imposes strict substantiation requirements for any deduction—including a depreciation deduction—with respect to "listed property." As defined in section 280F(d)(4), listed property includes "any passenger automobile" and "any other property used as a means of transportation." Petitioner failed to meet the strict substantiation requirements for the vehicles at issue, and no 2015 depreciation deduction is allowed with respect to them.

Regarding the remaining assets at issue (all of which are real properties), for us to estimate the amount of a deduction using the *Cohan* rule, petitioner must present some credible evidence that provides a rational basis for the estimate. *See Vanicek*, 85 T.C. at 742–43. We are not obligated to make an estimate under the *Cohan* rule where there is insufficient evidence to allow us to make a rational estimate. *See Lerch v. Commissioner*, 877 F.2d 624, 627–29 (7th Cir. 1989) (refusing to apply the *Cohan* rule where the taxpayer failed to present evidence to support claimed deductions), *aff'g* T.C. Memo. 1987-295. The taxpayer must supply some factual basis for an estimate; otherwise, the allowance would amount to "unguided largesse." *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957). With respect to the claimed 2015 depreciation deduction, we are unable to apply the *Cohan* rule because petitioner failed to introduce sufficient evidence supporting the 2015–17 depreciation schedule. Accordingly, we rule that petitioner failed to meet her burden of proof to show that A-1 is entitled to any depreciation deduction for 2015.

6.     *Miscellaneous Expenses*

Petitioner claimed A-1 is entitled to a $167,518 deduction for miscellaneous expenses paid using petitioner's personal American Express card. The payments were made to/for a variety of entities and expense categories, including restaurants, "clothes," sporting goods stores, "Cadillac," hotels, home improvement stores, "[t]ravel," a restaurant supply business, "[m]arketing," other transportation and vehicle services, "[f]ood," insurance companies, electronics stores, various utilities, etc.

Petitioner created a spreadsheet with categories of alleged miscellaneous 2015 expenses paid using her personal American Express card (2015 expense spreadsheet). She cited the 2015 expense spreadsheet and her personal American Express card statements in support of the expense deductions claimed. The 2015 expense

**[\*29]** spreadsheet lists only $158,732 in miscellaneous expenses paid, while the card statements include total payments in excess of $167,518. Petitioner did not specify the exact payments that make up the claimed $167,518 amount. Considering the hundreds of transactions made, we are unable to discern the payments that constitute the $167,518 amount. Rather than guess at unspecified payments, we will use the lower $158,732 amount shown on the 2015 expense spreadsheet. We rule that petitioner failed to meet her burden of proof to substantiate the deductibility of any payments not included in the $158,732 of expenses shown on the 2015 expense spreadsheet.

As stated *supra*, we recognize that a company like A-1 may incur numerous types of expenses in the operation of its business. The testimony of petitioner and other witnesses (in addition to documentary evidence) generally supported this. However, petitioner failed to fully substantiate the $158,732 paid. We make several rulings regarding this group.

First, petitioner failed to satisfy the strict substantiation requirements of section 274(d) for vehicle and travel expenses totaling $29,589. We rule that no part of those expenses is deductible.

Second, respondent previously conceded payments totaling $1,956 to Carnival Cruise Line. We rule that A-1 is not entitled to duplicative deductions for such payments.

Third, we find it probable that the restaurant supply expenses of $10,524 pertain to the restaurant businesses registered to petitioner's husband rather than to A-1. We rule that no part of those expenses is deductible.

Finally, considering the testimony and documentary evidence, we find it proper to apply the *Cohan* rule to estimate the portion of the remaining $116,663 that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from petitioner's personal American Express card, and the testimony/other evidence presented, we rule that $35,000 (approximately 30%) represents deductible business expenses for A-1.

**[\*30]**  D.  *2016 Additional Expenses*

1.  *Rent*

a.  *Rent Subgroup: A-1 Rent*

Petitioner claimed A-1 is entitled to a $36,771 deduction for rents paid for four units/buildings. The payments at issue were made from petitioner's joint bank account.

Six rent payments totaling $12,250 were made for the apartment in downtown New Orleans discussed *supra* OPINION Part V.C.1.b. It is unclear why petitioner included rent for this building in the 2016 A-1 Rent subgroup after including it in the 2015 Emergency Rent subgroup. Regardless, for the same reasons previously discussed, we rule that petitioner failed to meet her burden of proof to show that the $12,250 paid represented an ordinary and necessary business expense for A-1.

Five payments totaling $1,272 were made to Jetro Holdings, LLC. These payments were not explained, and we rule that petitioner failed to meet her burden of proof to show that they represented an ordinary and necessary business expense for A-1.

One payment of $5,250 was made to a person named Joan Lucky. The parties previously stipulated that this payment was a deductible rent expense, and it is included in the 2016 rent expenses respondent conceded. We rule that A-1 is not entitled to a duplicative deduction for this payment.

Twelve rent payments totaling $18,000 were made for the Tim's Soul Food building. For the same reasons discussed *supra* OPINION Part V.C.1.a, we rule that these payments are not ordinary and necessary business expenses for A-1.

b.  *Rent Subgroup: Emergency Rent*

Petitioner claimed A-1 is entitled to a $26,961 deduction for rent paid for the Houston apartment discussed *supra* OPINION Part V.C.1.b. For the same reasons previously discussed, we rule that rent paid for that apartment is an ordinary and necessary business expense for A-1.

**[\*31]**     2.     *Utilities*

Petitioner claimed A-1 is entitled to a $52,650 deduction for various utilities paid from petitioner's joint bank account. Such payments were mostly for electricity, though some were for phones, cable, and water. For the same reasons discussed *supra* OPINION Part V.C.2, we find it proper to apply the *Cohan* rule to estimate the portion of the utility expenses that is deductible by A-1 and rule that $37,000 (approximately 70%) represents deductible business expenses for A-1.

3.     *Contractors*

a.     *Contractor Subgroup: Contractor Checks*

Petitioner claimed A-1 is entitled to a $49,351 deduction for various checks paid mostly from petitioner's joint bank account, though one check was paid from A-1's bank account. The payments were made to various people and entities. For the same reasons discussed *supra* OPINION Part V.C.3.a, we find it proper to apply the *Cohan* rule to estimate the portion of the expenses that is deductible by A-1 and rule that $35,000 (approximately 70%) represents deductible business expenses for A-1.

b.     *Contractor Subgroup: Additional Expenses*

Petitioner claimed A-1 is entitled to a $110,950 deduction for payments made from A-1's bank account. Unlike the same subgroup payments for 2015, *see* discussion *supra* OPINION Part V.C.3.b, the payments for 2016 did not include payments made to restaurants, retail stores, travel/car expenses, and similar payees. Rather, nearly all of the payments were made to people, many of whom are, or appear to be, contractors or other people who performed work for A-1. We make two rulings regarding this subgroup.

First, respondent already conceded multiple payments totaling $2,480, and we rule that A-1 is not entitled to duplicative deductions for the payments.

Second, regarding the remaining $108,470 in claimed expenses, for the same reasons discussed *supra* OPINION Part V.C.3.b, we find it proper to apply the *Cohan* rule to estimate the portion of the $108,470 that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from A-1's bank account, and the testimony/other evidence

[*32] presented, we rule that $87,000 (approximately 80%) represents deductible business expenses for A-1.

### 4. *Transportation*

Petitioner claimed A-1 is entitled to a $74,140 deduction for alleged transportation expenses paid from petitioner's joint bank account. Checks and electronic withdrawals were paid to several entities, including BMW Bank, "WU Auto," Ford Credit, and Ally (presumably the insurance company). We make two rulings regarding this subgroup.

First, respondent already conceded three payments totaling $8,600, and we rule that A-1 is not entitled to duplicative deductions for the payments.

Second, regarding the remaining $65,540 in claimed expense deductions, travel and car and truck expenses are subject to the strict substantiation requirements of section 274(d). Petitioner failed to satisfy the section 274(d) substantiation requirements for any payment. We rule that A-1 is not entitled to deduct any of the remaining expenses claimed.

### 5. *Client Expenses*

#### a. *Client Spending*

Petitioner claimed A-1 is entitled to a $26,230 deduction for "Client Spending $." In support of the claimed deduction, petitioner points to cash withdrawals from her joint bank account. As discussed *supra* OPINION Part V.C.3.b, we will allow a deduction for cash payments shown on A-1's 2016 petty cash receipts, which total approximately $13,100. We accordingly rule that A-1 is entitled to a deduction for the cash withdrawals of only $13,100.

#### b. *Additional Client Expenses*

Petitioner claimed A-1 is entitled to a $174,967 deduction for additional client expenses paid from petitioner's joint account. We make several rulings regarding this subgroup.

First, $71,322 of the claimed deduction is attributable to checks paid to cash. As discussed *supra* OPINION Part V.D.5.a, we have already allowed a deduction for cash shown to be used in A-1's business.

[*33] We will allow no further deduction for cash withdrawn from petitioner's joint bank account. We rule that no portion of the $71,322 is deductible.

Second, $1,500 of the claimed deduction is attributable to a check written to petitioner. It was not established why this payment would constitute a client expense, and we rule that it is not deductible.

Third, respondent already conceded three payments totaling $1,800, and we rule that A-1 is not entitled to duplicative deductions for the payments.

Fourth, $1,610 of the claimed deduction is attributable to a check written to R&E Automotive. This check is for a vehicle-related service. The strict substantiation requirements of section 274(d) apply to this payment, which petitioner has not satisfied. We rule that this payment is not deductible.

Fifth, the remaining $98,735 was paid to various people and businesses, many of whom are, or appear to be, contractors or other people/businesses who performed work for A-1. Considering the testimony and documentary evidence regarding the payment of such people/entities, but also petitioner's failure to fully substantiate the deductibility of the $98,735, we find it proper to apply the *Cohan* rule to estimate the portion that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $69,000 (approximately 70%) represents deductible business expenses for A-1.

6. *Insurance*

Petitioner claimed A-1 is entitled to a $19,838 deduction for insurance payments made mostly to Blue Cross from petitioner's joint bank account.

For 2015 the parties stipulated that A-1 "paid employee insurance premiums in the amount of $27,484 to Humana Insurance," most of which was paid from petitioner's joint bank account. For 2016 the parties made no stipulation with respect to employee insurance premiums paid. Considering the payments of less than $250 made to Humana from petitioner's joint bank account in 2016, and the amounts of the payments made to Humana in 2015 and Blue Cross in 2016, it appears that A-1 changed employee insurance carriers from Humana to

**[\*34]** Blue Cross at the end of 2015 or the beginning of 2016. The preponderance of the evidence favors petitioner, and we rule that A-1 is entitled to the $19,838 insurance deduction claimed.

### 7.    *Depreciation*

Petitioner claimed A-1 is entitled to a $98,577 depreciation deduction. For the same reasons discussed *supra* OPINION Part V.C.5, we rule that no depreciation deduction for 2016 is allowable.

### 8.    *Miscellaneous Expenses*

#### a.    *Miscellaneous A-1 Expenses*

Petitioner claimed A-1 is entitled to a $59,937 deduction for miscellaneous expenses paid. Most of these payments ($32,722) were property tax payments made from A-1's bank account to Jefferson Parish, Louisiana. The remaining payments were made from petitioner's joint bank account to one person and a variety of entities, such as wireless carriers and retailers. We make several rulings regarding this subgroup.

First, regarding the property tax payments, petitioner has not shown the business purpose for each payment or which properties the payments are attributable to. However, considering the evidence regarding A-1's provision of housing to its clients and employees, we find it proper to apply the *Cohan* rule to estimate the portion of the $32,722 that is deductible by A-1. Considering A-1's business, the number of property tax payments made (21), the fact that the payments were made from A-1's account, A-1's lack of ownership of many of the properties at issue in this case, *see supra* note 27, various lease agreements, and the other evidence presented, we rule that $6,500 (approximately 20%) represents deductible business expenses for A-1.

Second, respondent already conceded a $124 payment, and we rule that A-1 is not entitled to a duplicative deduction for the payment.

Third, regarding the remaining $27,091, as stated *supra,* we recognize that a company like A-1 may incur numerous types of expenses in the operation of its business. While the testimony of petitioner and other witnesses (in addition to documentary evidence) generally supported the deductibility of a wide range of expenses, petitioner failed to fully substantiate the deductibility of the $27,091 paid. We find it proper to apply the *Cohan* rule to estimate the portion

**[\*35]** of the $27,091 paid that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $8,000 (approximately 30%) represents deductible business expenses for A-1.

b. *Miscellaneous American Express Expenses*

Petitioner claimed A-1 is entitled to a $357,635 deduction for miscellaneous expenses paid using petitioner's personal American Express card.

As discussed *supra* OPINION Part V.C.6, petitioner created a 2015 expense spreadsheet with categories of alleged miscellaneous expenses paid using her personal American Express card. Petitioner also created an expense spreadsheet for 2016 (2016 expense spreadsheet). Unlike the 2015 expense spreadsheet, the 2016 expense spreadsheet does not divide the card payments by category. Rather, the 2016 expense spreadsheet simply includes an "AMEX" category with monthly totals that add up to $389,713.[29] Petitioner also generally cited American Express card statements in evidence to support the claimed $357,635 deduction. Payments shown on the American Express card statements were made for a variety of categories, including restaurants, clothing, travel, gas, electronics, automobile, furniture, etc.

Considering the mishmash of expenses shown on the American Express card statements and petitioner's failure to make any effort to identify deductible expenses or expense categories, we find that we are unable to apply the *Cohan* rule to the claimed expenses. We rule that petitioner failed to meet her burden of proof to substantiate that any deductible business expenses were paid.

E. *2017 Additional Expenses*

1. *Rent*

a. *Rent Subgroup: A-1 Rent*

Petitioner claimed A-1 is entitled to a $16,500 deduction for rents paid for the Tim's Soul Food building. For the same reasons discussed

---

[29] The difference between the $389,713 amount shown on the 2016 expense spreadsheet and the $357,635 deduction petitioner claimed on brief was not explained.

**[\*36]** *supra* OPINION Part V.C.1.a, we rule that these payments are not ordinary and necessary business expenses for A-1.

### b. *Rent Subgroup: Emergency Rent*

Petitioner claimed A-1 is entitled to a $33,299 deduction for rents paid for the Houston apartment discussed *supra* OPINION Part V.C.1.b. For the same reasons previously discussed, we rule that rent paid for that apartment is an ordinary and necessary business expense for A-1.

### 2. *Utilities*

Petitioner claimed A-1 is entitled to a $38,148 deduction for various utilities paid from petitioner's joint bank account. Such payments were mostly for electricity, though some were for phones, cable, and water. For the same reasons discussed *supra* OPINION Part V.C.2, we find it proper to apply the *Cohan* rule to estimate the portion of the utility expenses deductible by A-1 and rule that $27,000 (approximately 70%) represents deductible business expenses for A-1.

### 3. *Contractors*

### a. *Contractor Subgroup: Contractor Checks*

Petitioner claimed A-1 is entitled to a $14,188 deduction for various checks paid from petitioner's joint bank account. We make two rulings regarding this subgroup.

First, respondent already conceded a $1,000 payment, and we rule that A-1 is not entitled to a duplicative deduction for the payment.

Second, regarding the remaining $13,188 in claimed expenses, for the same reasons discussed *supra* OPINION Part V.C.3.a, we find it proper to apply the *Cohan* rule to estimate the portion of the expenses deductible by A-1 and rule that $9,000 (approximately 70%) represents deductible business expenses for A-1.

### b. *Contractor Subgroup: Form 1099 Expenses*

Petitioner claimed A-1 is entitled to a $52,756 deduction for amounts shown on Forms 1099–MISC, Miscellaneous Income, introduced into evidence. The forms purport to show A-1's reporting of certain amounts paid to contractors, though it was not established whether the forms were actually filed with the Commissioner. The

**[*37]** parties have stipulated that A-1 did not issue Forms 1099 to some other people that it paid for services during each of the years at issue.

Respondent has previously conceded many of the amounts shown on the relevant forms. For example, a form regarding "Gleiny Hernandez" shows $1,674 paid by A-1, while respondent has previously conceded payments of $864 and $810 to "Gluny Hernandez." Similarly, a form regarding a person named Sedella Welch shows $16,100 paid by A-1, while respondent has previously conceded payments of $5,000, $2,100, and $9,000 to the same person. Other amounts respondent conceded include $841 paid to Myron Henderson, $900 paid to Rontryce Rogers, $816 paid to Heather Russel, $4,521 paid to Ezell Smith, and $1,080 paid to Edgar Vado.

Subtracting the amounts respondent already conceded leaves $26,824 in dispute. We have found checks paid from A-1's bank account to the remaining individuals at issue that add up to the amount shown on the Form 1099–MISC regarding each person. Considering the testimony regarding such individuals and the documentary evidence presented, we find that the preponderance of the evidence favors petitioner's position. We rule that the $26,824 paid is a deductible business expense for A-1.

### 4. *Transportation*

Petitioner claimed A-1 is entitled to a $115,532 deduction for alleged transportation expenses paid from petitioner's joint bank account. Payments were made to several entities, including BMW Bank, "Tinted Concepts of Marrero," Ford Credit, and gas stations.

Travel and car and truck expenses are subject to the strict substantiation requirements of section 274(d). The strict substantiation requirements of section 274(d) apply to the payments at issue. Petitioner has not met those requirements with respect to any payment. We rule that A-1 is not entitled to deduct any of the transportation expenses claimed.

### 5. *Client Expenses*

#### a. *Client Spending*

Petitioner claimed A-1 is entitled to a $23,178 deduction for "client spending." This amount comprised $22,478 in cash withdrawals, $600 in checks ($100 each) paid to several people, and one check paid to

[*38] cash. The six checks paid to individuals have nothing written in the memo lines, though the check paid to cash has a person's name written in the memo line. All withdrawals were made, and all checks were paid, from petitioner's joint bank account.

As discussed *supra* OPINION Part V.C.3.b, we will allow a deduction for cash payments shown on A-1's 2017 petty cash receipts, which total approximately $13,400. We accordingly rule that A-1 is entitled to a $13,400 deduction for the cash withdrawals.

Petitioner claims that the check payments totaling $700 were "made to, or on behalf of, A1's clients." Comparing the names on the six checks paid to individuals to a list of A-1's clients in evidence, it appears that none of the checks were written to clients. Nor is it clear what connection, if any, the payees (or the person whose name was written in the memo line of the check paid to cash) have to A-1. Considering the lack of explanation/evidence, we rule that petitioner failed to meet her burden of proof to substantiate that the check payments are deductible expenses for A-1.

b.    *Additional Client Expenses*

Petitioner claimed A-1 is entitled to a $249,822 deduction for additional client expenses. All payments constituting the $249,822 were made from petitioner's joint account. We make several rulings regarding this subgroup.

First, $52,042 of the claimed deduction is attributable to checks paid to cash. As discussed *supra* OPINION Part V.E.5.a, we already allowed a deduction for all the petty cash shown to have been used in A-1's business during 2017. We will allow no further deduction for cash allegedly used. We rule no portion of the $52,042 is deductible.

Second, respondent already conceded three payments totaling $4,880, and we rule that A-1 is not entitled to duplicative deductions for the payments.

Third, the remaining $192,900 was paid to various people and businesses, many of whom are, or appear to be, contractors or other people/businesses who performed work for A-1 and/or its clients. Considering the testimony and documentary evidence regarding the payment of such people/entities, but also petitioner's failure to fully substantiate the deductibility of the $192,900, we find it proper to apply the *Cohan* rule to estimate the portion that is deductible by A-1.

**[*39]** Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $135,000 (approximately 70%) represents deductible business expenses for A-1.

### 6. *Insurance*

Petitioner claimed A-1 is entitled to a $42,172 deduction for insurance. In support of the claimed deduction, petitioner points to payments made to Blue Cross, "Citizens General," Humana, "Direct General Auto," and Liberty Mutual from petitioner's joint bank account.

For the same reasons discussed *supra* OPINION Part V.D.6, we rule that $33,249 paid to Blue Cross and $189 paid to Humana are deductible insurance expenses for A-1.

Petitioner has provided no evidence or argument regarding the remaining insurance payments. Some of the payments are for car/truck insurance subject to the strict substantiation requirements of section 274(d), which petitioner has not satisfied. We rule that petitioner failed to meet her burden of proof to substantiate that any insurance payments not paid to Blue Cross or Humana are deductible business expenses for A-1.

### 7. *Depreciation*

Petitioner claimed A-1 is entitled to a $91,952 depreciation deduction. For the same reasons discussed *supra* OPINION Part V.C.5, we rule that no depreciation deduction for 2017 is allowable.

### 8. *Miscellaneous Expenses*

#### a. *A-1 Bank Account Expenses*

Petitioner claimed A-1 is entitled to a $179,547 deduction for miscellaneous expenses paid from A-1's bank account and the reversal of certain amounts transferred into the account. We make several rulings regarding the claimed deduction.

First, petitioner claims that $79,000 should be "[r]everse[d] out transfer from kids account erroneously included in income." Because the parties stipulated a 2017 income amount for A-1 that (apparently) does not include in income transfers from accounts in the names of

**[*40]** petitioner's children, *see supra* note 11, we rule that no offsetting deduction is allowable.

Second, $38,800 in checks was paid to Colette Branch. Most of the checks had nothing written in the memo line, though one appears to have petitioner's signature written in the memo line. No explanation was provided for why such payments would constitute miscellaneous expenses for A-1. We rule that none of these payments are deductible.

Third, $6,208 in payments to Leonard Welch, Larry Riley, and Waukesha Riley were already allowed as part of the deductions discussed *supra* OPINION Part V.E.3.b. We rule that no additional deduction is allowed with respect to these payments.

Fourth, one check for $250 was paid to cash. As discussed *supra* OPINION Part V.E.5.a, we already allowed a deduction for all the petty cash shown to have been used in A-1's business during 2017. We will allow no further deduction for cash allegedly used. We rule no portion of the $250 is deductible.

The remaining $55,289 in claimed expenses was paid to a variety of people and entities. As stated *supra*, we recognize that a company like A-1 may incur numerous types of expenses in the operation of its business. While the testimony of petitioner and other witnesses (in addition to documentary evidence) generally supported the deductibility of a wide range of expenses, petitioner failed to fully substantiate the deductibility of the $55,289 paid. Considering the testimony and documentary evidence, we find it proper to apply the *Cohan* rule to estimate the portion of the $55,289 paid that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from A-1's bank account, and the testimony/other evidence presented, we rule that $39,000 (approximately 70%) represents deductible business expenses for A-1.

b.      *Petitioner's Joint Bank Account Expenses*

Petitioner claimed A-1 is entitled to a $152,732 deduction for miscellaneous expenses paid from petitioner's joint bank account. We make several rulings regarding this subgroup.

First, respondent already conceded three payments totaling $6,784, and we rule that A-1 is not entitled to duplicative deductions for the payments.

**[\*41]** Second, checks totaling $6,350 were paid to cash. As discussed *supra* OPINION Part V.E.5.a, we already allowed a deduction for all the petty cash shown to have been used in A-1's business during 2017. We will allow no further deduction for cash allegedly used. We rule no portion of the $6,350 is deductible.

Finally, the remaining payments of $139,598 were made to a variety of people and entities, including Sam's Club, electronics stores, a wireless provider, etc. Considering the testimony and documentary evidence regarding the payment of similar people/entities, but also petitioner's failure to fully substantiate the deductibility of the $139,598, we find it proper to apply the *Cohan* rule to estimate the portion that is deductible by A-1. Considering A-1's business, the types and amounts of expenses, the various payees, the fact that the payments were made from petitioner's joint bank account, and the testimony/other evidence presented, we rule that $56,000 (approximately 40%) represents deductible business expenses for A-1.

### c. *Miscellaneous American Express Expenses*

Petitioner claimed A-1 is entitled to a $500,929 deduction for miscellaneous expenses paid using petitioner's personal American Express card.

Similar to what she did for 2016, petitioner created an expense spreadsheet for 2017 (2017 expense spreadsheet). Like the 2016 expense spreadsheet, the 2017 expense spreadsheet does not divide up the American Express card payments by category. Rather, the 2017 expense spreadsheet simply includes an "AMEX" category with monthly totals that add up to $579,514.[30] Petitioner also generally cited the American Express card statements in evidence to support the claimed $500,929 deduction. Payments shown on the American Express card statements were made for a variety of categories, including restaurants, clothing, travel, gas, insurance, automobile, utilities, etc.

Considering the mishmash of expenses shown on the American Express card statements and petitioner's failure to make any effort to identify deductible expenses or expense categories, we find that we are unable to apply the *Cohan* rule to the claimed expenses. We rule that

---

[30] The difference between the $579,514 amount shown on the 2017 expense spreadsheet and the $500,929 deduction petitioner claimed on brief was not explained.

**[\*42]** petitioner failed to meet her burden of proof to substantiate any deductible business expenses were paid.

VI.     *Additions to Tax*

The Commissioner has the burden of producing evidence with respect to the liability of any individual for any addition to tax. § 7491(c). To satisfy that burden, the Commissioner must offer sufficient evidence to indicate that imposing the addition to tax is appropriate. *Higbee*, 116 T.C. at 446.

A.      *Section 6651(a)(1) and (2) Additions to Tax*

Section 6651(a)(1) imposes an addition to tax for failing to file an income tax return by the due date (including extensions). To satisfy his burden of production, the Commissioner must show that the taxpayer did not file a return by the due date. *See Wheeler v. Commissioner*, 127 T.C. 200, 207–08 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

Section 6651(a)(2) imposes an addition to tax for failing to pay taxes when due. To satisfy his burden of production, the Commissioner must show that an income tax return was filed, or an SFR was prepared, showing a tax liability for the relevant year. *See Wheeler*, 127 T.C. at 210.

If the Commissioner satisfies the burden of production for additions to tax under section 6651(a), the taxpayer bears the burden of proving the additions to tax are inappropriate. *Wheeler*, 127 T.C. at 206; *Higbee*, 116 T.C. at 446–47; *see also* § 6651(a)(1) and (2). A taxpayer may demonstrate that additions to tax are inappropriate by establishing reasonable cause, which requires showing that, despite exercising ordinary business care and prudence, the taxpayer was unable to file the return or pay the tax, as applicable, on time, typically for reasons outside the taxpayer's control. Treas. Reg. § 301.6651-1(c)(1).

Petitioner concedes that she did not file income tax returns for the years at issue. The IRS consequently prepared an SFR for each year, and the record contains a copy of each SFR and a certification validating each SFR. *See* § 6020(b); Treas. Reg. § 301.6020-1(b)(2). The SFRs show a tax liability for each year at issue. Accordingly, respondent has satisfied his burden of production with respect to the section 6651(a)(1) and (2) additions to tax.

**[\*43]** Petitioner claimed that she had reasonable cause for her failure to file tax returns for the years at issue. Petitioner alleged that she provided her tax advisor, Mr. Thornton, with all necessary information to prepare and timely file her tax returns, but that he advised her to delay filing because of the audit for her 2014 tax year. When asked at trial whether she had "a return filing requirement," petitioner testified that she was aware that she did.

In *Morris v. Commissioner*, T.C. Memo. 2021-120, at \*7–8, we stated:

> Taxpayers may demonstrate reasonable cause for failing to file a return timely through their good-faith, reasonable reliance on the advice of an independent, competent tax professional that no return was required to be filed. [*United States v. Boyle*, 469 U.S. 241, 250–51 (1985).] Reliance on such advice "do[es] not sanction an abdication of responsibility for the timely filing of a return admittedly due." *United States v. Kroll*, 547 F.2d 393, 397 (7th Cir. 1977); *see also Fleming v. United States*, 648 F.2d 1122, 1125–1126 (7th Cir. 1981). The Code provides an unambiguous deadline, and "no special training or effort [is required] to ascertain \* \* \* that it is met." *Boyle*, 469 U.S. at 252.

> [Taxpayers] were not advised that they were not required to file a return. The alleged advice was to delay filing while audits for prior years were completed. Allowing such a basis for reasonable cause would make timely filing optional for any taxpayer under audit. [Taxpayers] were aware that they had a duty to file a return timely and consciously failed to file. It is well settled that taxpayers must file timely returns using the best information available to them and may file amended returns if necessary. *Estate of Vriniotis v. Commissioner*, 79 T.C. 298, 311 (1982).

(Footnote omitted.) Regardless of the alleged advice provided by Mr. Thornton,[31] for the reasons discussed in *Morris*, T.C. Memo. 2021-120,

---

[31] Similarly to the advisor at issue in *Morris*, Mr. Thornton did not testify at trial. We are skeptical of petitioner's allegations regarding advice Mr. Thornton gave to her. We need not accept a taxpayer's testimony that is self-serving and uncorroborated by other evidence. *See, e.g.*, *Shea*, 112 T.C. at 189.

**[\*44]** at \*7–8, we rule that the reasonable cause defense does not apply and that the section 6651(a)(1) addition to tax applies for each year at issue.

Petitioner did not raise the reasonable cause defense with respect to the 6651(a)(2) additions to tax. Petitioner has not alleged or shown that Mr. Thornton or any other person advised her not to pay the amounts shown due on the SFRs. Nor has petitioner provided any other reason for her failure to pay. Accordingly, we rule that the reasonable cause defense does not apply and that the section 6651(a)(2) addition to tax applies for each year at issue.

B.      *Section 6654 Addition to Tax*

Section 6654(a) imposes an addition to tax on an individual for failure to make required estimated tax payments. This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required installment is generally equal to 25% of the "required annual payment." § 6654(d). The required annual payment is equal to the lesser of (1) 90% of the tax shown on the return for the tax year at issue (or, if no return is filed, 90% of the tax for such year) or (2) if the individual filed a return for the immediately preceding tax year, 100% (or in certain circumstances 110%) of the tax shown on that return. § 6654(d)(1); *see Wheeler*, 127 T.C. at 210–11. An SFR is not considered to be a return for purposes of section 6654(d)(1)(B). *See, e.g.*, *Kupersmit v. Commissioner*, T.C. Memo. 2016-202, at \*34; *Duma v. Commissioner*, T.C. Memo. 2009-304, 2009 Tax Ct. Memo LEXIS 306, at \*18 n.6.

To satisfy the burden of production, the Commissioner must show that the taxpayer had a required annual payment. *See Wheeler*, 127 T.C. at 211–12. As part of this burden, the Commissioner must establish the tax shown on the taxpayer's return for the preceding year or demonstrate that the taxpayer filed no such return. *Id.*; *Harvey v. Commissioner*, T.C. Memo. 2023-95, at \*6–7; *Collins v. Commissioner*, T.C. Memo. 2020-50, at \*47. Except as provided in section 6654(e)(3)(B), no reasonable cause exception exists for the section 6654(a) addition to tax. Treas. Reg. § 1.6654-1(a)(1); *see also Bray v. Commissioner*, T.C. Memo. 2008-113, 2008 Tax Ct. Memo LEXIS 114, at \*20.

Petitioner filed her 2014 return in April 2016, reporting adjusted gross income of $393,305 and total tax of $66,566. Respondent calculated her 2015 section 6654(a) addition to tax based on 110% of the

**[\*45]** tax shown on her 2014 return, *see* § 6654(d)(1)(B)(ii), (C)(i), which was less than 90% of the tax shown on the 2015 SFR, *see* § 6654(d)(1)(B)(i). Because petitioner did not file a 2015 or 2016 return, respondent calculated her 2016 and 2017 section 6654(a) additions to tax based on 90% of the tax shown on the 2016 and 2017 SFRs, respectively. Considering the facts regarding petitioner's 2014 return, petitioner's failure to file returns for the years at issue, and respondent's calculations for the section 6654 additions to tax,[32] we rule that respondent has met his burden of production and that a section 6654 addition to tax applies for each year at issue.

VII. *Conclusion*

We hold that (1) petitioner's filing status for the years at issue is married filing separate, (2) petitioner is entitled to a portion of the Schedule A deductions respondent contested, (3) A-1 incurred deductible Schedule C expenses greater than those respondent conceded, and (4) petitioner is liable for additions to tax pursuant to sections 6651(a)(1) and (2) and 6654. We have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[32] Respondent determined that petitioner had federal tax withholdings of $2,520 for 2015 and $91 for 2017. Respondent accounted for these amounts when calculating the section 6654 additions to tax for 2015 and 2017.